(No. 41784.—

PAUL SCHMIDT et al., Appellees, vs. ARCHER IRON WORKS, INC., Appellant.

*Opinion filed January 28, 1970.—Rehearing denied March 23, 1970.*

VOGEL & VOGEL, of Chicago, (L. H. VOGEL and ROBERT GURITZ, of counsel,) for appellant.

WILLIAM P. NOLAN, and PRETZEL, STOUFFER, NOLAN & ROONEY, both of Chicago, (JOSEPH B. LEDERLEITNER, of counsel,) for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Paul Schmidt brought this product liability action in the circuit court of Cook County to recover from Archer Iron

Works, Inc., for personal injuries he received when part of a tubular concrete pouring tower allegedly manufactured by Archer fell upon him at a bridge construction site at which he was employed. In separate counts, Schmidt's wife sought damages for loss of consortium, and an insurance carrier sought subrogation for workmen's compensation payments made on behalf of Schmidt's employer. Following the reservation of Archer's motion for a directed verdict made at the close of all the evidence, the jury returned verdicts for Paul Schmidt in the amount of $250,000, for his wife in the amount of $15,000, and for the workmen's compensation insurer in the amount of $35,871.58. The trial court vacated the jury verdicts in favor of the plaintiffs, granted Archer's post-trial motion for judgment *n.o.v.*, and conditionally denied Archer's alternative motion for a new trial. On the plaintiffs' appeal the Appellate Court, First District, reversed the judgment and remanded the cause with instructions to reinstate the judgments on the original jury verdicts. (98 Ill. App. 2d 82.) We allowed Archer's petition for leave to appeal.

The facts are fully set forth in the opinion of the appellate court, and we restate them only to the extent necessary for the determination of the issues on this appeal.

It is undisputed that the instrumentality which caused Schmidt's injury was a metal "eye" pin used to secure a concrete pouring chute to a 104-foot-high tower in such a way that the pouring chute could be rotated to channel the flow of concrete in various directions. On August 5, 1954, as a result of a separation in a factory weld which had bonded two parts of the eye pin together, the uppermost chute in the pouring system fell and struck Schmidt, who was working near the base of the pouring tower, injuring him severely.

It is incumbent upon a plaintiff in a product liability case to prove that his injuries resulted from an "unreasonably dangerous" condition of the product and that "the con-

dition existed at the time it left the manufacturer's control." (*Suvada* v. *White Motor Co.*, 32 Ill.2d 612.) This case is unusual in that it is undisputed that the eye pin was defectively manufactured and that this defect was the proximate cause of the plaintiff's injuries. The narrow issue before us is whether there was sufficient evidence that the defendant furnished the defective pin to justify the jury's verdict.

The record shows that in August of 1953 Pacific Bridge Company, a bridge contractor, ordered through the Victor L. Phillips Co., a dealer in construction equipment, a concrete pouring tower and certain accessories. In response to this order, the Phillips Company placed a purchase order with Archer for the following items:

"1—104'  Archer Heavy Duty Single Well
         2-WB Tubular Tower Complete
1—506    42 Cu. Ft. Concrete Bucket
1—508    50 Cu. Ft. Tower Hopper with Dumping
         Chute
1—513    Boom Spout Bridle Seat
2—30HS   30 ft. Swivel Head Chutes
1—501    10 ft. Std. Taper Chute"

A boom spout bridle seat is a bracket-like device used for bolting a boom spout bridle securely to a sliding frame affixed to the legs of the tower. A boom spout bridle is a swivel mount upon which the pouring chute rests in a V-shaped bridge. An integral component of the boom spout bridle is an eye pin functionally equivalent to the one which precipitated the accident in the case at bar. The eye pin is a stock item for which there is no separate catalogue listing. It is a component part of a boom spout bridle, and in the Archer price list, from which the Phillips Company obviously prepared its order, it is listed under a separate number and with a separate price: "List No.: 18  Boom Spout Bridle $38.00."

The evidence clearly shows that neither a boom spout bridle nor an eye pin was specifically mentioned in the Phillips purchase order to Archer, in Archer's shop order, or in Archer's invoice for the merchandise. Whether Pacific specifically ordered the bridle and pin from Phillips does not affirmatively appear; nor does it appear whether Phillips had the critical items in stock itself or whether it procured them from some source other than Archer. The record is similarly silent as to what specific items of equipment were shipped to Pacific, precisely when and where they were delivered, or who, if anyone, had access to them during the interval before assembly. It is clear that several days after delivery when Pacific's workmen began to assemble the tower from the parts that had been placed on the river bank, they were able to construct a complete tower fully functional for the purpose of pouring concrete. They were able to do so without adding, purchasing, repairing, or field-welding any parts.

After Pacific had used the tower it dismantled it, returned it to the river bank and nine months later sold it to the E. L. Harlin Construction Company, plaintiff's employer. During this interval, the dismantled pieces of the tower lay unboxed and untended on the river bank. The bill of sale from Pacific to Harlin described the identical items that appeared in Phillips's order from Archer. It identified those items by Archer's price list numbers. Harlin reassembled the tower without adding, repairing, or field-welding any parts and again had a fully functional pouring tower, including a bridle assembly and eye pin. It was after this second assembly and approximately 13 months after the tower was sold to Pacific that the pin failed, causing the plaintiff's injuries.

Officers of Archer Iron Works testified unequivocally that the pin in question was not manufactured or supplied by that company and did not resemble the pins it usually

produced. A second pin, identified by Archer's officers as the type of pin they always manufacture, appeared to be substantially different in character from the pin which actually caused the accident. Evidence favorable to the plaintiffs, on the other hand, shows that the pin in question had been factory welded and painted the same rust color with which Archer painted the other parts of the tower; there is no evidence that it had been rewelded or repainted in the field. On the basis of these facts, the trial court concluded that the plaintiffs had adduced no evidence, direct or circumstantial, that Archer had manufactured, sold, or delivered the pin. The appellate court disagreed. In our opinion the judgment of the trial court was correct.

In *Pedrick* v. *Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 510, after an exhaustive review of the relevant case law in this and other jurisdictions, we held that directed verdicts or judgments *n.o.v.* should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Applying this rule to the facts of this case, we agree with the trial judge that the evidence viewed most favorably to the plaintiffs so overwhelmingly supports the defendant's position that no contrary verdict based on that evidence could ever stand.

The plaintiffs' evidence failed to establish sufficient connection between the admittedly defective pin and Archer. The defendant offered uncontradicted testimony that it did not manufacture the defective pin and that the pin was unlike any that it had ever produced. The plaintiffs showed only that the eye pin in question broke at a factory weld and that it was painted a rust color similar to the other parts of the tubular tower. In view of the evidence that many other equipment-supply manufacturers paint their parts and accessories with a protective rust-colored coating,

that evidence shows no more than that Archer was one of several possible manufacturers which could have supplied the pin.

There was no direct chain of documentary evidence linking the bridle and pin to Archer. The plaintiffs contend that in the context for which the apparatus was ordered the word "complete" in Phillips's purchase order to Archer and in the Pacific bill of sale to Harlin contemplated a fully operational concrete pouring tower including the parts necessary to allow rotation of the pouring chutes. But this argument overlooks the fact that both of these documents specified other items necessary to the functioning of the tower. They also place great emphasis on the fact that approximately two days after delivery of Archer's material at the river bank, workmen were able to assemble from that material a fully functional concrete pouring tower, including a boom spout bridle and eye pin, without adding, purchasing, or repairing any parts. The possibility is not negatived, however, that Phillips either had a boom spout bridle and eye pin in stock or procured these parts from a source other than Archer and had them delivered to the construction site during the two-or-three-day interval in which the Archer material lay untended on the river bank. It is also pertinent in this regard that the defective pin which ultimately caused Schmidt's injuries was found in the apparatus 13 months after its original sale, after it had passed through two hands, and after it had lain untended on the river bank near the construction site for nine months.

The judgment of the appellate court is reversed and that of the circuit court of Cook County is affirmed.

*Appellate Court reversed;*
*circuit court affirmed.*