ELIZABETH J. LOWRIE, Indiv. and as Adm'x of the Estate of John A. Lowrie, Deceased, Plaintiff-Appellant, *v.* THE CITY OF EVANSTON *et al.*, Defendants-Appellees.

First District (5th Division)   No. 76-301

Opinion filed June 24, 1977.

Donald M. Haskell and Daniel J. Pope, both of Chicago (Haskell & Perrin, of counsel), for appellant.

Charles E. Eklund and Victor J. Piekarski, of Querrey, Harrow, Gulanick & Kennedy, Ltd., of Chicago, for appellee The City of Evanston.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (James T. Ferrini, Stephen D. Marcus, and Thomas H. Ryerson, of counsel), for appellee Ralph E. Albrecht.

Ruff and Grotefeld, Ltd., of Chicago (John J. Reidy and John P. Blake, of counsel), for appellee E. W. Corrigan Construction Company.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Jean Hamm, of counsel), for appellee Loeble, Schlossman, Bennett & Dart, Inc.

Richard E. Mueller and Richard F. Johnson, both of Lord, Bissell & Brook, of Chicago, for appellee DeLeuw, Cather & Co.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This appeal involves the propriety of an order dismissing counts I and II, sounding in strict products liability and implied warranty respectively, of plaintiff's second amended complaint (hereafter the complaint).

It was generally alleged in counts I and II that the death of plaintiff's decedent resulted from injuries received in a fall from an upper level of an open air parking garage in the city of Evanston after he had paid for the use of a parking space therein. It was additionally alleged in each count that defendant Evanston was the owner-operator and defendant Albrecht the managing agent of the garage; that both were in the business of leasing it and the parking spaces within to the general public for a profit; that defendant Corrigan was the general contractor for the construction of the garage; that defendant Loebl, Schlossman, Bennett & Dart, Inc., performed the construction architectural work; that defendant DeLeuw, Cather & Company performed the construction engineering work; and that these latter three defendants participated in the placement of the garage into the stream of commerce for use by the general public.

The allegations in count I, which sounded in strict products liability, were (1) that the garage and parking spaces were in a defective and not reasonably safe condition because they were so constructed, designed and engineered (a) "that the parking bumpers and guards did not allow sufficient space for persons to move about their automobiles, and that the weight of a person coming in contact with them would not be projected inward and away from exterior openings"; and (b) "that they did not have guard rails and/or restraints to prevent individuals from falling from the windows and openings therein"; (2) that there were no adequate warnings given concerning the dangers of using said structure and the parking spaces therein; (3) that the said defective and not reasonably safe condition existed at the time the parking structure and parking spaces were placed in the stream of commerce and left the possession of control of each of the defendants; and (4) that the said defective and not reasonably safe condition was the proximate cause of death of plaintiff's decedent.

In count II, it was also alleged that each defendant impliedly warranted "that said parking structure and the parking spaces therein were fit for the

purpose of allowing persons to safely park their automobiles there and to safely use said premises," and that this warranty was breached because (a) the parking bumpers and guards did not allow sufficient space for persons to move about their automobiles and that "the weight of a person coming in contact with them would not be projected inward and away from exterior openings"; (b) that guard rails or other restraints were not provided to prevent individuals from falling from the windows and openings; and (c) that no adequate warnings were given concerning the dangers of using the premises. It was alleged also that the breach of implied warranty was a proximate cause of the death of plaintiff's decedent.

The motions to dismiss counts I and II by all defendants were granted. Count III, which the trial court found to have alleged a cause of action based upon negligence, is not involved in this appeal and remains pending in the trial court.

OPINION

■■■ The general question presented on appeal is whether a cause of action was stated in either of counts I and II. In this regard, we note the rule that motions to dismiss a pleading admit facts well pleaded but not conclusions unsupported by allegations of specific facts upon which such conclusions rest. (*Burke v. Sky Climber, Inc.* (1974), 57 Ill. 2d 542, 316 N.E.2d 516.) In determining the propriety of the dismissal of a complaint or portions thereof, we are concerned only with the question of law presented by the pleadings. *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538.

It is the position of plaintiff that he has stated a cause of action in count I under the concept of strict liability in tort as set forth in the Restatement (Second) of Torts §402A (1965), and adopted in Illinois in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182. In its final form, section 402A in pertinent part provides:

> "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property * * *."

In determining whether a strict products liability cause of action has been stated, we are initially concerned with the question as to whether the constructed building here, a multi-level open air garage, is a product within the meaning of the use of that term in the Restatement. Because this question is one of first impression, some historical background is required. In this regard, we note that comment *b* of section 402A traces the history of the doctrine from its original application to those engaged in the business of selling food and other products intended for intimate

bodily use to its present extension, which includes the sale of any product that, if defective, may be expected to cause physical harm to the consumer or his property

In comment *d* to section 402A, what appears to be an attempt to define the meaning of the phrase "sale of any product" resulted in a mere listing of various types of products, as follows:

> "The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide. It applies also to products which, if they are defective, may be expected to and do cause only 'physical harm' in the form of damage to the user's land or chattels, as in the case of animal food or a herbicide." (Restatement (Second) of Torts, Explanatory Notes, §402A, comment *d*, at 350 (1965).)

We note also that no definition of the term "product" appears in the works of Prosser, the driving force behind strict products liability. Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791 (1966); Prosser, *Products Liability in Perspective*, 5 Gonz. L. Rev. 157 (1970).

The vast majority of Illinois courts which have been faced with the application of the doctrine have not been confronted with the specific issue of "what is a product?" The particular item with which they were concerned was clearly a "product." The ten decisions of our supreme court which have guided and shaped the doctrine of strict products liability as we know it in Illinois involved defective packaging of nailable steel flooring (*Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 311 N.E.2d 128), whole blood (*Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 266 N.E.2d 897), a can of Drano (*Moore v. Jewel Tea Co.* (1970), 46 Ill.2d 288, 263 N.E.2d 103), a concrete nail (*Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170), a truck's clearance-light lens (*Vlahovich v. Betts Machine Co.* (1970), 45 Ill. 2d 506, 260 N.E.2d 230), a trenching machine (*Williams v. Brown Manufacturing Co., Inc.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305), an eye pin (*Schmidt v. Archer Iron Works, Inc.* (1970), 44 Ill. 2d 401, 256 N.E.2d 6, *cert. denied* (1970), 398 U.S. 959), a carpenter's hammer (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401), a 1961 Corvair (*People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 226 N.E.2d 6), and a used, reconditioned tractor (*Suvada*).

There have been a few Illinois cases, however, where this issue has been raised. The first to have considered what is a product for strict liability purposes was *Housman v. C. A. Dawson & Co.* (1969), 106 Ill. App. 2d 225, 245 N.E.2d 886. In that case, the trial court directed a verdict for defendant in an action for injuries incurred in a fall when a two-by-four which had been purchased from defendant broke as plaintiff was standing upon it between two rafters for support. The trial court expressed doubt as to whether lumber was a product within the ambit of strict liability, and the appellate court perfunctorily resolved the question by holding that lumber was such a product.

Probably the most well-known Illinois case dealing with the issue of what is a product is *Cunningham*, where our supreme court held that whole human blood was a product. It focused on comment *e* of the Restatement, which states that section 402A is not limited to articles which already have undergone some processing before sale, and the court held "[w]hile whole blood may well be viable, human tissue, and thus not a manufactured article of commerce, we believe that it must in this instance be considered a 'product' in much the same way as other articles wholly unchanged from their natural state which are distributed for human consumption. [Citations.]" (47 Ill. 2d 443, 447, 266 N.E.2d 897, 899.) However, the court did not set down any guidelines with regard to what are products for purposes of strict liability, with the exception of clarifying the fact that certain items in their natural state do qualify.

Probably the least known Illinois case dealing with the issue is *Willeford v. Mayrath Co.* (1972), 7 Ill. App. 3d 357, 287 N.E.2d 502, where a manufacturer sold a disassembled farm elevator in accordance with a customer's order that was later assembled by a supplier. In this instance the order did not include a safety shield provided by the manufacturer, the absence of which was alleged to have been the cause of plaintiff's injury. The trial court, *inter alia*, struck the strict liability count and, on plaintiff's appeal, the appellate court affirmed holding that the manufacturer was not liable for the alleged design defect which first came about after the parts left its premises and after they had been assembled into a "product" by the supplier. The court stated, "[T]he machine did not exist nor the alleged dangerous defect (*i.e.*, the power take-off attachment without the shield) could not have become a part of the machine until it had been assembled [from various possible combinations], which was not while it was in the defendant's control. The plaintiff failed to establish this basic element of his case." 7 Ill. App. 3d 357, 361, 287 N.E.2d 502, 505.

An interesting case in which the issue of what is a product arose in *Whitmer v. Schneble* (1975), 29 Ill. App. 3d 659, 331 N.E.2d 115. There, dog owners were sued by a child who had been bitten. They filed a third-party complaint against the seller of the dog alleging, among other things,

that the seller was liable under strict liability for selling an inherently dangerous dog. It was held that the dog was not a "product," and the court said that to hold otherwise would defeat the purpose behind strict liability which was "to insure that the costs of injuries resulting from defective products are borne by those who market such products rather than by the injured person, who are powerless to protect themselves. [Citation.]" 29 Ill. App. 3d 659, 663, 331 N.E.2d 115, 119.

The most notable facet about *Whitmer* is that it focused on the policies behind the imposition of strict liability as the factors to be considered in determining whether something is or is not a product as the term is used in section 402A. This approach appears to be in accord with the treatment by the courts of other aspects of strict liability. It was originally felt, for example, that there must be a "sale" of a product in order to invoke strict liability. However, over the years the term "seller" in section 402A has been expanded to include those who, absent a sale, placed a product into the stream of commerce—such as a bailor who leases a motor vehicle (*Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178) or a supplier who makes a loan of a propane gas tank (*Bainter v. Lamoine LP Gas Co.* (1974), 24 Ill. App. 3d 913, 321 N.E.2d 744; see also *Delaney v. Towmotor Corp.* (2d Cir. 1964), 339 F.2d 4). Thus, it is clear that the courts have refused to be arbitrarily confined to a restricted definition of the term "seller." Rather, as they have in their treatment of the term "product," the courts have focused on the public policy reasons underlying strict liability and have held that the term should apply to one who places a defective product in the stream of commerce, whether by actual sale or in some other specified manner.

So also does it appear that policy considerations have some effect on another aspect of strict liability essentially undefined—the term "defective condition." Section 402A refers to "any product in a defective condition unreasonably dangerous to the user or customer * * *." The phrase "unreasonably dangerous" was intended as a definition of a defective product (see comments *g*, *i*), but it otherwise remains without specific definition, which appears to be in accordance with the application of strict products liability law to changing conditions and times. As stated in *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 323, 229 N.E.2d 684, 688, *aff'd* (1969), 42 Ill. 2d 339, 247 N.E.2d 401, "case law should progress with the progress of technology and the changing notions of justice, and that 'defect must remain an open ended term.' [Citation.]"

It appears to us that public policy reasons for the imposition of strict liability have accounted for the expansion of the doctrine from its original concept which centered in the field of chattels. It has now been applied to the builder-vendor of mass produced homes. (See, *e.g., Schipper v. Levitt*

*& Sons, Inc.* (1965), 44 N.J. 70, 207 A.2d 314; *Kriegler v. Eichler Homes, Inc.* (1969), 269 Cal.App.2d 224, 74 Cal. Rptr. 749; see also Prosser, Torts §104, at 682 (4th ed. 1971).) It should be noted, however, that these cases do not deal with a defect in the home *per se* but with a defect in some product installed therein. Thus, it appears to us that these builder-vendor cases apply strict liability to a contractor who sells a defective product along with the home, as distinguished from holding that a home is itself a product.

■■ In view of the foregoing, we are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than, as plaintiff here would have us do, to focus on the dictionary definition of the word. A general statement of these reasons appears in comment *c* of section 402A, which states:

> "On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford . it are those who market the products." (Restatement (Second) of Torts, Explanatory Notes §402A, comment *c*, at 349-50 (1965).)

Further, as one writer has stated:

> "[I]n order to determine whether a particular transaction comes within the definition of the 'sale of any product' it becomes necessary to isolate the social policy justifications for the imposition of strict liability.
>
> * * *
>
> Ultimately both the definition of 'product' and 'sale' can be determined only with reference to these policy justifications. Generally, where they apply, the court will label the transaction as involving the sale of a product to which strict liability applies. Thus the social policy underlying the doctrine has become the definition of a 'product' and 'sale'." *Symposium on Products Liability: What*

*is or is not a Product Within the Meaning of Section 402A,* 57 Marq. L. Rev. 623, 626-27 (1974).

Thus, we believe that strict liability did not evolve simply because something was a product. The policy reasons brought it into being and continued to expand it. It is those reasons then that should determine what is a product and not that it was simply something resulting from production, or "produced naturally or as a result of a natural process," the dictionary definition, or the meaning given in 72 C.J.S. *Products* 1210 (1951) that defendant would have us accept: "Anything produced, * * * as a result of * * * labor, or thought * * *." Such definitions would exclude water, wood, all living things, and anything else that remains in the natural state at the time it is supplied or distributed. Significantly, whole blood which was found to be a product in *Cunningham* would also be excluded.

■■ We have considered those underlying policy reasons in their relation to the development of the strict products liability concept, and we have come to the conclusion that a building such as is involved here is not a product within the meaning of the use of that term in section 402A.

We have also taken into consideration in reaching this conclusion the fact that in *Cox v. Shaffer* (1973), 223 Pa. Super. 429, 302 A.2d 456, which appears to be the only case in the country involving the specific question, the court held, without stating any supporting reasons, that a silo constructed on a farmer's land was not a product within the meaning and intent of section 402A. Additionally, we have considered the significance of a statement by the court in *Greenman v. Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 63-64, 377 P.2d 897, 901, 27 Cal. Rptr. 697, 701, the progenitor of the doctrine, that the purpose of strict liability is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. *Sales warranties serve this purpose fitfully at best.* [Citation.]" (Emphasis added.) This statement not only articulated the purpose but also the court's reason for imposing strict liability. Sales warranties then could not adequately provide a remedy for injured plaintiffs, because the doctrines of privity and express disclaimers of warranty would bar recovery. At that time, the *Greenman* court believed that a judicial remedy should be provided, and it conceived the strict liability doctrine. In Illinois, because judicial remedies are presently available against those responsible for defective construction on negligence and implied warranty theories, the reason expressed in *Greenman* does not appear to justify bringing a constructed building within the ambit of strict liability.

Moreover, we believe that the framers did not originally contemplate a structure such as a building to be a product. This is evidence (a) from the

fact that although comment *d* lists a number of products within the purview of section 402A, it does not include buildings; and (b) because the liability of builders is described and articulated in other sections of the Restatement, it appears to us that if structures and their builders were to be held to strict liability the framers of the Restatement would not have included the standard of care pertinent to builders, contractors and sellers of real property set forth in sections 353, 385 and comment *e* of section 389.

■■ Plaintiff also contends, as she does with respect to the garage structure, that the parking spaces within it were in a defective and not reasonably safe condition. We believe, however, that our reasoning in holding that the garage was not a product as contemplated by section 402A is equally applicable to the parking spaces which were part of the structure itself.

Accordingly, as a matter of law, we hold that count I did not state a cause of action on the basis of strict liability, and it was properly dismissed.

■■ Plaintiff next contends that each defendant breached an implied warranty that the garage and spaces therein were safe to use. She alleges that defendant impliedly warranted the garage and parking spaces "* * * were fit for the purpose of allowing persons to safely park their automobiles there and to safely use said premises." However, she had cited no authorities, and we have found none, supporting such an implied warranty. She argues that her theory of implied warrant stems from the cases of *Jack Spring, Inc. v. Little* (1972), 50 Ill. 2d 351, 280 N.E.2d 208, *Hanavan v. Dye* (1972), 4 Ill. App. 3d 576, 281 N.E.2d 398, and *Weck v. A:M Sunrise Construction Co.* (1962), 36 Ill. App. 2d 383, 184 N.E.2d 728. These cases are not controlling, as they stand only for the rule that there may be an implied warrant of habitability where a contractor-builder sells or leases, as in *Spring*, directly to a lay person. Here, of course, we are not concerned with habitability and, in any event, such an implied warranty is limited to cases where the contractor-builder sells directly to the lay person. (*Garcia v. Hynes & Howes Real Estate, Inc.* (1975), 29 Ill. App. 3d 479, 331 N.E.2d 634.) Her allegations that the premises were unsafe do not assert an implied warranty of fitness for a particular purpose. They are basically allegations of negligence that are also set forth in count III, which remains pending.

Neither do we believe that count II asserts a warranty of the type mentioned in comment *m* of section 402A, where it was stated:

> "A number of courts, seeking a theoretical basis for the liability, have resorted to a 'warranty,' either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. * * * There is nothing in this

Section which would prevent any court from treating the rule stated as a matter of 'warranty' to the user or consumer. But if this is done, it should be recognized and understood that the 'warranty' is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.

\* \* \*The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, 'warrant' must be given a new and different meaning if it is used in connection with this Section." (Restatement (Second) of Torts, Explanatory Notes §402A, comment *m* at 355-56 (1965).)

Parenthetically, it should be noted, however, that comment *m* also contains the following statement: "[i]t is much simpler to regard the liability here stated as merely one of strict liability in tort," and that, in *Sterner Aero AB v. Page Airmotive, Inc.* (10th Cir. 1974), 499 F.2d 709, 712, the court stated:

"Many jurisdictions have gradually abandoned the whole concept of implied warranty in products liability, adopting instead the simpler and more manageable concept of strict liability in tort as exemplified by §402A, Restatement of the Law of Torts 2d. This strict liability in tort is substantially similar to implied warranty stripped of the contract defenses of privity, notice, disclaimer and the other contract attributes."

In any event, even if the allegations of count II were intended to assert strict liability upon the warranty concept expressed in comment *m*, plaintiff would still be confronted by the fact that the building in question was not a product within the meaning of the term as used in section 402A.

In view thereof, we conclude that the trial court properly dismissed count II as not stating a cause of action and, because we have similarly held as to count I, it will not be necessary to consider other contentions raised by the various parties.

The judgment is affirmed, and this cause is remanded for the disposition of proceedings remaining in the trial court.

Affirmed and remanded.

LORENZ and WILSON, JJ., concur.