658 P.2d 434

Davis Peter BEGAY, Plaintiff-Appellant,

v.

Nellie LIVINGSTON, Defendant-Appellee,

and

William Livingston and Janice Livingston, dba, the Livingston Hotel, Defendants-Appellees Third Party Plaintiffs and Cross Appellants,

and

Montgomery Ward & Company, Inc., Defendant-Third Party Defendant and Cross Appellee.

No. 5028.

Court of Appeals of New Mexico.

Nov. 12, 1981.

Daniel Shapiro, Ortega & Snead, P.A., Steven Michael, Albuquerque, for plaintiff-appellant.

J.M. Scarborough, Espanola, for defendant-appellee, Nellie Livingston.

J. Duke Thornton, James H. Johansen, Shaffer, Butt, Thornton & Baehr, P.C., Albuquerque, for defendants-appellees third party plaintiffs and cross-appellants William Livingston and Janice Livingston.

Bruce D. Black, William G. Wardle, Campbell, Byrd & Black, P.A., Santa Fe, for defendant-third party defendant and cross-appellee Montgomery Ward & Co., Inc.

## OPINION

SUTIN, Judge.

On March 28, 1977, Peter Begay, decedent, checked into Room 7 of the Livingston Hotel, Espanola, New Mexico. The following morning, he was found dead as a result of lethal levels of carbon monoxide in the blood caused by carbon monoxide gas that escaped from the gas space heater located in the room.

On January 23, 1980, plaintiff, as personal representative of decedent's estate, filed a second amended complaint. Joined as defendants were (1) William and Janice Livingston (The Livingstons), owners and operators of the hotel since October 10, 1972; (2) Nellie Livingston (Nellie), prior owner, who had the gas heater installed in the early 1960's; (3) Montgomery Ward and Company, Inc., the manufacturer and seller of the gas heater; and (4) Gas Company of New Mexico, supplier of the gas.

The second amended complaint consisted of seven counts.

*Count I* is directed against The Livingstons based upon broad grounds of negligence with reference to the heater, its appurtenances and position in the room. Count I is not at issue in this appeal.

*Count II* is directed against The Livingstons under the doctrine of *res ipsa loquitur*. The Livingstons were granted summary judgment from which plaintiff appeals.

*Count III* is directed against Nellie based upon general grounds of negligence. Nellie was granted summary judgment from which plaintiff appeals.

*Count IV* is directed against The Livingstons and Nellie under the doctrine of strict liability. Summary judgment was granted these defendants from which plaintiff appeals.

*Count V* is directed against Montgomery Ward under the doctrine of strict liability. Summary judgment was granted from which plaintiff appeals.

*Count VI* is directed against Montgomery Ward on the basis of negligence. Montgomery Ward was granted summary judgment from which plaintiff appeals.

*Count VII* is directed against the Gas Company for negligence. Count VII is not an issue in this appeal.

Plaintiff appeals from summary judgments granted defendants in Counts II, III, IV, V and VI.

The Livingstons filed a cross-claim against Montgomery Ward for indemnity or contribution. Montgomery Ward was

granted summary judgment from which The Livingstons appeal.

The plaintiff's and The Livingstons' appeal represent the only judgments from which an appeal has been taken. The order entered on December 12, 1980, included other judgments entered from which no appeal has been taken. Those judgments remain final and effective regardless of the disposition made in this appeal.

On January 5, 1981, plaintiff appealed from summary judgments granted The Livingstons, Nellie and Montgomery Ward.

On January 13, 1981, The Livingstons appealed from the order that dismissed their cross-claim with prejudice.

We affirm as to Counts II, III and IV (Nellie) and reverse as to Count IV (The Livingstons), Counts V and VI and the Third Party Complaint of The Livingstons.

## INTRODUCTION

Unfortunately, parties in an appeal that involve summary judgments do not follow the rules established in *Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972). The rules and violations thereof have been repeated many times. *Harmon v. Atlantic Richfield Co.,* 95 N.M. 501, 623 P.2d 1015 (Ct.App. 1981). Before a party is entitled to summary judgment in the trial court, the movant must establish a prima facie case that no genuine issue of material fact exists, or that the party is entitled to summary judgment as a matter of law. If the movant fails, summary judgment should be denied. If the movant succeeds, the burden then shifts to the opponent to come forward with evidence to create a genuine issue of material fact.

■ In an appeal, *in each count stated in* which summary judgment is granted, an appellant's Brief-in-Chief must show that defendant failed to make a prima facie case, or, if it did, that appellant met the burden of showing that a genuine issue of material fact existed. If the parties do not follow this procedure in an appeal, the burden shifts to this Court to solve the many problems raised.

It is unnecessary to set forth the rules governing summary judgments. They have been stated innumerable times without any appreciable effect in district courts. Any reasonable doubt as to the existence of a genuine issue of fact will be resolved against the movant.

Before we can reach the merits of this appeal, a jurisdictional question was raised by Montgomery Ward.

Montgomery Ward mistakenly claims The Livingstons' notice of appeal was not timely filed. Summary judgment was entered December 12, 1980, Plaintiff filed a timely notice of appeal on January 5, 1981. The Livingstons' notice was filed January 13, 1981.

■ Rule 3(a) of the Rules of Appellate Procedure for Civil Cases provides that an appeal may be taken within thirty days after any final judgment or interlocutory order. Where multiple parties are involved, this rule applies to the first party taking an appeal. If subsequent parties decide to appeal, they are governed by Rule 4(c) which pertains to "Service of notice of appeal." It reads in part:

> If such service [of plaintiff's notice of appeal] be made later than fifteen days before expiration of the time within which the appeal may be taken, *any party so served may himself take an appeal within fifteen days after such service.* [Emphasis added.]

■ Plaintiff's Notice of Appeal was deposited in the mail January 5, 1981, postage prepaid, addressed to all lawyers of record. The expiration date of plaintiff's appeal was January 12, 1981. Plaintiff's service of notice of appeal, allowing three days for mailing, Rule 6(e) of the Rules of Civil Procedure, was effected January 8, 1981, 4 days before the expiration date. Fifteen days before the expiration date was December 28, 1980. Therefore, service by plaintiff was made "later than fifteen days before expiration of the time within which the appeal may be taken." Plaintiff's service of notice of appeal was effective January 8, 1981. The Livingstons appealed January

13, 1981, five days thereafter, within the 15 days allowed.

The Livingstons' appeal was timely filed.

### A. Summary judgment granted The Livingstons on res ipsa loquitur is affirmed.

Count II of plaintiff's complaint stated a claim for relief under the doctrine of *res ipsa loquitur*. U.J.I. 16.23. It alleged that while decedent was in Room 7 of the Livingston Hotel, the exhaust venting from the heater was or became disconnected from the ceiling juncture; that as a proximate result of the disconnection, decedent died from carbon monoxide; that this disconnection does not generally occur except through negligence, and that The Livingstons had exclusive control and management over the gas heater and exhaust venting in this room.

■ To make a prima facie case, The Livingstons had the burden of establishing as a matter of law that (1) the gas heater and exhaust vents were not in their exclusive control and (2) this death did not ordinarily happen in the absence of negligence. *Deakin v. Putt*, 93 N.M. 58, 596 P.2d 271 (Ct.App.1979).

The Livingstons attacked one aspect of the doctrine of *res ipsa loquitur*—lack of "exclusive control"; that decedent "had every opportunity to adjust the heater, the vent, or to dislodge the vent from the ceiling duct. Thus . . . [decedent] had at least equal control, if not superior control . . . ."

■ Under the doctrine of *res ipsa loquitur* "exclusive control" of defendant is the first factor to be established. It is stated in U.J.I. 16.23 as follows:

1. that the injury or damage to plaintiff was proximately caused by (Name of instrumentality or occurrence) which was under the exclusive control *and* management of the defendant . . . . [Emphasis added.]

■ Heretofore, only the word "control" was used in the definition of *res ipsa loquitur*. Today, the words "and management" have been added. "Exclusive control and management" has not yet been defined. In a general way, the word "control" refers to power or authority to manage, superintend, direct or oversee. *Hardware Mutual Casualty Company v. Crafton*, 233 Ark. 1020, 350 S.W.2d 506 (1961). "Control" and "manage" are synonymous. "Exclusive" as used in this context means "sole." The phrase "exclusive control and management" of an instrumentality means "the sole power or authority of defendant to superintend, direct or oversee" the instrumentality. As it has been said, " 'Exclusive control' is not a rigid, inflexible term . . . ." *Archibeque v. Homrich*, 88 N.M. 527, 531, 543 P.2d 820 (1975). It also embodies "right to control," and the doctrine applies if defendant had either "exclusive control" or "right of control," *Collins v. Stroh*, 426 S.W.2d 681 (Mo. App.1968), but "right of control" is of no consequence unless it can be effectively exercised, *Freitag v. City of Montello*, 36 Wis.2d 409, 153 N.W.2d 505 (1967).

The application or non-application of "exclusive control" has been discussed in *Harless v. Ewing*, 81 N.M. 541, 469 P.2d 520 (Ct.App.1970); *Renfro v. Coggins Company*, 71 N.M. 310, 378 P.2d 130 (1963); and *Waterman v. Ciesielski*, 87 N.M. 25, 528 P.2d 884 (1974).

In *Harless*, we held that where a lessor leases a truck to a lessee but reserves the right to maintain the truck, and the lessor instructs the lessee's driver on the maintenance of the truck, the lessor had "exclusive control" over the maintenance of the truck. When the truck broke down and a tire hurled a wheel that struck the face of the driver, *res ipsa loquitur* was applicable because the lessor had "exclusive control" over the maintenance of the truck prior to the unfortunate event. We are concerned with control prior to the breakdown, not after. In other words, we are not concerned with control exercised at the time of the injury but control exercised at the time of the negligent act which subsequently results in injury.

In *Renfro*, we held that where the seller of a grader undertook the repair of its

brakes, it had "exclusive control" over this repair work, but if there was nothing more than surmise or speculation that connected this control with the injury, "exclusive control" was ineffective and *res ipsa loquitur* was not applicable.

*Waterman* held that where a plaintiff truck driver had a contractual right of control of a crate that caused his injury, the defendant did not have "exclusive control."

■ As applied to the instant case, prior to rental of Room 7 of The Livingstons' hotel to decedent, The Livingstons had "exclusive control" of this room. The question to decide is:

> After The Livingstons rented Room 7 to decedent, did The Livingstons retain exclusive authority to manage the operation of the heater and exhaust venting? The answer is "no" because The Livingstons parted with control and relinquished it to decedent.

In a landlord-tenant relationship, the tenant has a contractual right of control. The general rule is that where a landlord leases premises to a tenant, the landlord does not have "exclusive control" over the instrumentality *within the leased premises. King v. Wiesel,* 67 R.I. 182, 21 A.2d 262 (1941); *Magerstaedt v. Eric Company,* 64 Wash.2d 298, 391 P.2d 533 (1964); *Work v. Des Moines Coliseum Co.,* 207 N.W. 679 (Iowa 1926); *Szyca v. Northern Light Lodge No. 121,* 199 Minn. 99, 271 N.W. 102 (1937); *Hogan v. Miller,* 153 Cal.App.2d 107, 314 P.2d 230 (1957); *Seligman v. Simon,* 83 A.2d 682 (Del.Super.1951); *Napolin v. Hotel Rose,* 137 C.A.2d 701, 290 P.2d 925 (1955); *Horne v. Adams,* 218 A.2d 513 (D.C.App. 1966); *Miratsky v. Beseda,* 139 Neb. 229, 297 N.W. 94 (1941). As *Hogan, supra,* said:

> The doctrine does not apply when the injury *might* have been caused by plaintiff's negligence or have been due to one of several causes, for some of which the defendant is not responsible. [Emphasis added.] [314 P.2d 236.]

■ The Livingstons, at the time of decedent's occupancy, had no control over the gas supply in Room 7, the lighting of the heater or the position of the exhaust vent. We cannot infer, assume or presume that the exhaust venting from the heater to the ceiling juncture was disconnected at the time of the rental. If it became disconnected after the rental, it *might* have been caused by decedent.

As a tenant, decedent was in control of the leased premises, and, to focus on The Livingstons' lack of control, we point to the fact that the tenant is subject to liability under the doctrine of *res ipsa loquitur* to a third person injured on the leased premises. *Miratsky, supra, Grugan v. Shore Hotels Finance & Exchange Corp.,* 126 N.J.L. 257, 18 A.2d 29 (1941); *Windas v. Galston & Sutton Theatres,* 35 Cal.App.2d 533, 96 P.2d 170 (1939).

■ To avoid any misunderstanding on the application of *res ipsa loquitur* under the landlord-tenant relationship, we point out that the doctrine *does* apply if the landlord retains possession or control of a portion of the leased premises such as a hot water heater closet located outside the apartment rented and not accessible from the apartment, *Strong v. Shaw,* 96 N.M. 281, 629 P.2d 784 (Ct.App.1980), or when the instrumentality that causes the injury is outside of and separate from the area covered by the leased premises and which instrumentality is under the exclusive control of the landlord. *Panaroni v. Johnson,* 158 Conn. 92, 256 A.2d 246 (1969); *Walsh v. Phillips,* 399 S.W.2d 123 (Mo.1966); *Wright & Taylor, Inc. v. Smith,* 315 S.W.2d 624 (Ky.1958); *Rothenberg v. Monarch Refrigeration Company of Chicago,* 9 Ill.App.2d 565, 133 N.E.2d 763 (1956); *Haag v. Harris,* 4 Cal.2d 108, 48 P.2d 1 (1935).

We would be remiss in our duty if we failed to note that Pennsylvania discarded the "exclusive control" doctrine and adopted Restatement, Second, Torts § 328 D on *res ipsa loquitur, Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94, 101 (1974), in which the court said:

> Exclusive control may eliminate other causes, but the critical inquiry is not control but whether a particular defendant is the *responsible cause* of the injury. [Emphasis by court.]

Absent "exclusive control," The Livingstons were not subject to the doctrine of *res ipsa loquitur.* Summary judgment as to Count II of plaintiff's complaint is affirmed.

**B.** *Summary judgment granted Nellie on Count III is affirmed.*

Count III alleged that Nellie negligently designed Room 7 in that the gas heater exhaust venting was in close proximity to the sink and could have been easily dislodged by an occupant; that she negligently installed, furnished and maintained an unreasonably dangerous gas heater and exhaust venting in Room 7; that she knew or should have known they were unreasonably dangerous; that she negligently failed to inspect, detect or correct the gas heater and the gas supply; that she negligently failed to correct the dangerous design and condition of the exhaust venting.

Nellie, now 80 years of age, was the owner of the Livingston Hotel when her husband died in 1962. Ten years later she deeded the hotel to The Livingstons. From 1972 to 1977, the year of decedent's death, The Livingstons were in exclusive control and management of the hotel.

When Nellie sold the property to The Livingstons in 1972, genuine issues of material fact existed with reference to two dangerous conditions: (1) whether Nellie failed to have the elbow joint screwed to the ceiling pipe contrary to the gas code; and (2) whether Nellie placed the heater in a dangerous position immediately adjacent to the sink. If these dangerous conditions existed, the failure to correct these conditions was negligent conduct. *Anderson v. Welsh,* 86 N.M. 767, 527 P.2d 1079 (Ct.App. 1974); *Mitchell v. C & H Transp. Co., Inc.,* 90 N.M. 471, 565 P.2d 342 (1977); *Sanchez v. J. Barron Rice, Inc.,* 77 N.M. 717, 427 P.2d 240 (1967).

To make a prima facie case for summary judgment Nellie must show, under the circumstances of this case, that liability could not arise after having divested herself of ownership, possession and control of the property on October 10, 1972. This is a matter of first impression.

The rules which control vendor-vendee liability for existent dangerous conditions, generally followed in the country, are Restatement, Second, Torts § 352 and 353 (1965), each of which read as follows:

§ 352. Dangerous Conditions Existing at Time Vendor Transfers Possession

Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

§ 353. Undisclosed Dangerous Conditions Known to Vendor

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

Section 353 carves out an exception to the general rule of non-liability, applicable when the vendor conceals or fails to disclose to the vendee a condition which poses an unreasonable risk to persons on the property. Plaintiff does not claim that Nellie

concealed or failed to disclose any such condition. As a result plaintiff's complaint does not state a claim upon which relief can be granted. But we are confronted with summary judgment. Our duty is to show that even if the complaint were amended to include concealment or failure to disclose, Nellie is entitled to summary judgment.

Comment (a) following § 352 points out that the ancient doctrine of caveat emptor has retained much of its original force. It then states:

> This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and liabilities. *The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer. Still less is he liable to any third person who may come upon the land, even though such entry is in the right of the vendee.* [Emphasis added.]

To this rule an exception has developed as to undisclosed dangerous conditions known to the vendor, as to which see § 353.

Section 353 Comment (c) states:

> It is not, however, necessary that the vendor have actual knowledge of the condition, or that he be in fact aware that it involves an unreasonable risk of physical harm to persons on the land. It is enough that he has reason to know that the condition exists and is dangerous, as "reason to know" is defined in § 12(1)— that is to say, that he has information from which a person of reasonable intelligence, or his own superior intelligence, would infer that the condition exists, or would govern his conduct on the assumption that it does exist, and would realize that its existence will involve an unreasonable risk of physical harm to persons on the land.

■ For Nellie to make a prima facie case, she must establish that she did not conceal or fail to disclose to The Livingstons any defect in the heater and venting of which she had reason to know, that later caused the asphyxiation of deceased.

We say with *Copfer v. Golden,* 135 Cal. App.2d 623, 288 P.2d 90, 95 (1955) "Section 353 treats of concealed and undiscovered conditions known to the grantor and has no application to the facts of the present case." *Copfer* involved grantors who were parents of the grantee, and grantors were sued for injuries suffered by a child while playing upon the property of the grantee. In the instant case, Nellie was the grantor and William Livingston, the grantee, was her nephew.

Once a year, Nellie had the Gas Company and a plumber check the hotel. From 1962 to 1972, the year the hotel was deeded to The Livingstons, no incident or event occurred nor did any information reach Nellie which would give her some reason to know of the existence of any dangerous condition. As stated in *Graham v. United States,* 441 F.Supp. 741, 745 (1977):

> There is no evidence or reason to conclude that the defendant Government or a private individual real estate vendor would under these facts have reason to know, or should have inferred or assumed that the condition of a ventilation pipe clogged by a bird nest, leaves, and twigs existed in the home heating system.

In *Cropper v. Rego Distribution Center, Inc.,* 461 F.Supp. 529 (D.C.Del.1978), Coastal Supply Company owned the land upon which an allegedly defective rising system was installed prior to purchase of the land and riser system. Plaintiff sought summary judgment. The court said:

> According to the uncontroverted facts Coastal Supply Co. did not know of any defect in the riser system. Assuming for the moment that Coastal Supply Co. is properly chargeable with a duty to warn with respect to this equipment, the only factual question left, then, under the Restatement is whether Coastal Supply Co. should have known of the defect.... [T]he only evidence plaintiffs have adduced on the issue of whether defendant [Coastal] should have known of the defect is that the defendant used the equipment

for a substantial period of time prior to the sale. It is not at all clear, were this the sum of the plaintiffs' case to be presented to the jury, that plaintiffs could survive a directed verdict in favor of the defendant. [Id. 534–5.]

 Nellie produced affidavits that made a prima facie case for non-liability under § 353. When Nellie sold the hotel to The Livingstons, none of the exceptions of § 353 existed. The burden then shifted to plaintiff who was unable to come forward with any evidence to create a genuine issue of material fact.

Summary judgment for Nellie on Count III of plaintiff's complaint is affirmed.

C. *Summary judgment granted The Livingstons on Count IV, strict liability, is reversed and that of Nellie's affirmed.*

 Count IV of plaintiff's complaint realleged and incorporated by reference "all previous paragraphs in this Complaint." This broad reference includes the previous claims of *res ipsa loquitur* as applied to The Livingstons and the claim against Nellie, both of which have been removed from further consideration. Plaintiffs often persist in this unacceptable type of pleading. District courts should summarily dismiss complaints with this style of pleading.

This count joins The Livingstons and Nellie as parties who are alleged to be liable under the doctrine of strict liability; that these parties were jointly and severally in the business of supplying the unreasonably dangerous gas heater and exhaust vents in Room 7 in the stream of commerce to the public including decedent; that these parties expected these dangerous instrumentalities to reach the public in a substantially unchanged manner after installation, maintenance and inspection prior to the time Room 7 was let to decedent and during his occupancy.

Plaintiff did not pursue any claim against Nellie under Count IV, and waived it. Summary judgment in favor of Nellie is affirmed.

To make a prima facie case, The Livingstons must establish that, jointly or severally, non-liability exists under Restatement, Second, Torts § 402A as adopted, interpreted and applied in New Mexico.

The Livingstons merely stated that "the theory of strict products liability should not apply to a motel owner, when the customer is injured by a defective heater;" that an "innkeeper . . . is liable only for a lack of reasonable care in keeping his premises reasonably safe for guests or other invitees."

In other words, The Livingstons seek an affirmance of summary judgment as a matter of law not fact. If the doctrine of strict liability is applicable to an innkeeper under the facts of this case, summary judgment must be reversed.

We hold that the doctrine of strict liability is applicable to The Livingstons.

It has been held that one who is in the business of leasing an automobile or airplane is subject to liability under the doctrine of strict products liability. *Stang v. Hertz Corporation,* 83 N.M. 730, 497 P.2d 732 (1972); *Rudisaile v. Hawk Aviation, Inc.,* 92 N.M. 778, 595 P.2d 751, 598 P.2d 641 (Ct.App.1978), Sutin, J., dissenting, rev'd, 92 N.M. 575, 592 P.2d 175 (1979).

It has also been held that one who is in the business of renting furnished apartments is subject to liability for a defective product, a couch, which is supplied as part of the rental apartment, *Fakhoury v. Magner,* 25 Cal.App.3d 58, 101 Cal.Rptr. 473 (1972), or one who equips the apartment with a defective wall panel heater, *Golden v. Conway,* 55 Cal.App.3d 948, 128 Cal.Rptr. 69 (1976).

 *Fakhoury* and *Golden* point to the difference between one who is in the business of renting apartments with defective "products" included therein, and renting the bare premises only. The premises alone is not a "product" and the landlord is not subject to liability. A building is not a product. Neither is a parking ramp or parking space within it. *Lowrie v. City of Evanston,* 50 Ill.App.3d 376, 8 Ill.Dec. 537, 365 N.E.2d 923 (1977). No definition of

368

"product" has yet been created and the dictionary definition is not the answer. *Lowrie, supra.* See, *Chapman v. Lily Cache Builders, Inc.,* 48 Ill.App.3d 919, 6 Ill.Dec. 176, 362 N.E.2d 811 (1977).

On the other hand, it has been held that a landlord is not liable to a tenant of long duration in a multi-family apartment dwelling for injuries sustained by a defective hot water faucet. "To apply the broad brush of strict liability to the landlord-tenant relationship in a dwelling house would impose an unusual and unjust burden on property owners." *Dwyer v. Skyline Apartments, Inc.,* 123 N.J.Super. 48, 301 A.2d 463, 467 (1973), affirmed, 63 N.J. 577, 311 A.2d 1 (1973). The Livingstons rely on *Dwyer.*

We are not involved with a dwelling such as a leased home or apartment and do not resolve the issues in these conflicting opinions. We are involved with a motel where transient tenants occupy a room. A hotel or motel is engaged in a commercial enterprise in which rooms are rented to a large number of persons. These persons deserve as much protection as the law will allow.

■ We hold that The Livingstons who are in the motel business and rent furnished rooms to the public with defective products therein, such as heating and exhaust venting, are subject to liability under the doctrine of strict products liability. The summary judgment granted The Livingstons is reversed.

D. *Summary judgment granted Montgomery Ward on Count V, strict liability, is reversed.*

Count V of plaintiff's complaint alleged that Montgomery Ward was the manufacturer and seller of the gas heater found in Room 7 of the Livingston Hotel, and was in the business of selling it to the general public and consumer public, including Nellie Livingston; that it was in the business of placing the heater in the stream of commerce to reach the general public, including plaintiff's decedent; that the heater was expected to and did reach the user, including decedent, without substantial change in which it was sold; that it was in a defective condition unreasonably dangerous when it was sold and as a proximate result of the defective condition of the heater in Room 7, decedent died from carbon monoxide asphyxiation.

In its answer, Montgomery Ward admitted that it conducted its business in Rio Arriba County in which the Livingston Hotel is located but denied that it manufactured or sold the heater to Nellie. It established as a matter of law that it was not the manufacturer of the heater.

■ A genuine issue of material fact arose as to whether Montgomery Ward was the seller. To make a prima facie case, the burden was on Montgomery Ward to establish that it was not the seller. It failed to do so. Summary judgment was erroneous.

On the heater, a decal was found which said:

"Montgomery Ward Co., Chicago, Illinois"

It has been held that a decal on a snowmobile which read "Ariens" was sufficient evidence to identify defendant as the manufacturer. *Smith v. Ariens Co.,* 375 Mass. 620, 377 N.E.2d 954 (1978). Likewise, the decal on the heater was sufficient evidence to identify Montgomery Ward as the seller. It was the seller in Rio Arriba County in which the Livingston Hotel was located. A reasonable inference can be drawn that Montgomery Ward sold its heater to Nellie in 1962.

There are other existing issues of fact on the condition and defective design of the heater at the time it was sold to The Livingstons and whether or not changes were made.

For purposes of determining whether a genuine issue of material fact exists within the meaning of § 402A, we believe it important to resolve the matter for purposes of trial.

Paraphrasing the pertinent parts of § 402A, as set forth in *First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 85, 537 P.2d 682 (Ct.App.1975), it reads:

A ... [seller] of a product (1) in *a defective condition, unreasonably dangerous (2) to the user or consumer,* is subject to liability if the ... [seller] expects its product to reach the user or consumer, and the product does reach the user or consumer (3) *without substantial change in the condition in which it is sold,* even though the ... [seller] has exercised all possible care in the preparation and sale of the product. [Emphasis theirs.]

To make a prima facie case, Montgomery Ward must establish that the heater it sold to Nellie was not at the time of sale in a defective condition, unreasonably dangerous to decedent in Room 7 of the Livingston Hotel. It is unquestionable that Montgomery Ward knew that in the sale of a heater to a hotel, it expected the heater to reach a user who rented a room and that the heater did reach decedent in Room 7.

Montgomery Ward made no proof, by affidavit or deposition, of material facts which disclosed that the heater was not in a defective condition unreasonably dangerous to the user at the time it left Montgomery Ward's or that the heater was in a substantially unchanged condition from which it was sold at the time of decedent's death. The meaning of "defective condition" and "unreasonably dangerous" are defined in *Rudisaile, supra* [92 N.M. 575, 577, 592 P.2d 175].

Montgomery Ward relies on the deposition it took of Robert F. Harrison, a consulting engineer, employed by The Livingstons. Mr. Harrison did not know the time frame in which the heater was probably manufactured. He knew nothing of the condition of the heater at the time it was sold, nor whether it was purchased new or secondhand, nor where it was purchased or when. He did not dismantle nor disassemble it. As a result, he had no evidence that the heater was defectively designed or manufactured.

In his opinion, the cause of decedent's death was that the heater was very badly overfired because of overpressure; that it had more gas input than it could properly burn; that there was additional damage to the inside of the heater which caused restrictions to the flow of gases through the heater; that this combination caused the heater to produce heavy concentrations of carbon monoxide; that the vent pipe, from some unknown cause, became disconnected; that the products of combustion which included the heavy concentration of carbon monoxide to be discharged in the room was breathed in by decedent.

The bottom of the heater showed a very distorted and burned out piece of metal on the back side of it. It was warped and bent out to where it had restricted the otherwise normal circulation through the heater and allowed gases to escape in the room. This was a present defect in the heater, not necessarily a manufactured defect.

We do not find it necessary to include additional deposition testimony of Mr. Harrison.

Tom Thompson, a commercial mechanical inspector employed by the City of Albuquerque, stated in an affidavit:

That in my opinion, based upon my experience as gas inspector, that overall, the installation, maintenance, and design of the gas space heater resulted in an unsafe and dangerous condition which was likely to cause serious harm to those occupying Room No. 7.

We hold that a genuine issue of material fact exists. Summary judgment granted Montgomery Ward on Count V is reversed.

E. *Summary judgment granted Montgomery Ward on Count VI is reversed.*

Count VI of plaintiff's complaint charged, in addition to its Count V claim, *supra,* that Montgomery Ward negligently and improperly designed, manufactured, assembled, installed, adjusted, and inspected the gas heater unit in Room 7 of the Livingston Hotel.

Montgomery Ward established that it did not manufacture the heater but there it ends. It failed to make a prima facie case. Summary judgment granted Montgomery Ward on Count VI is reversed.

F. *Summary judgment granted Montgomery Ward on The Livingstons' Third Party Complaint is reversed.*

The Livingstons filed a Third Party Complaint against Montgomery Ward for indemnity or contribution based upon the strict liability theory. For reasons heretofore stated with reference to Count V, *supra,* summary judgment is reversed.

G. *Conclusion*

Summary judgment granted The Livingstons on *res ipsa loquitur,* Count II, is affirmed.

Summary judgment granted Nellie Livingston on general grounds of negligence, Count III, and strict liability, Count IV, are affirmed.

Summary judgment granted The Livingstons on strict liability, Count IV, is reversed.

Summary judgments granted Montgomery Ward on strict liability, Count V, and negligence, Count VI, are reversed.

Summary judgment granted Montgomery Ward on The Livingstons Third Party Complaint is reversed.

Costs of this appeal shall be paid one third each by Plaintiff, The Livingstons and Montgomery Ward.

IT IS SO ORDERED.

LOPEZ, J., concurs.

WALTERS, C.J., concurring in part and dissenting in part.

WALTERS, Chief Judge (concurring in part, dissenting in part).

I agree with the results reached by the majority on the counts discussed in Paragraphs A, B, D, E, and F. I do not agree with the majority's criticism stated under Paragraph C regarding the pleadings in this case and feel it is unjustified, since ours is not a code pleading jurisdiction. New Mexico's only requirement is that the pleadings be short and plain. Rule 8(a) N.M.R.Civ.P., N.M.S.A.1978.

I disagree with the majority's disposition of Count IV of the complaint for the following reasons:

Our U.J.I. (Civil) Nos. 14.2–14.5, N.M.S.A. 1978, impose "ordinary care" standards against anyone who might be considered a "supplier" of a product. In other words, the supplier is subject to a claim of negligence. With but few exceptions, the Instructions of Chapter 14 on "Products Liability" are couched in terms of "ordinary care." It is manifest from the instruction in that chapter that "products liability" is not automatically synonymous with "strict liability" in New Mexico.

The application of strict liability upon a supplier, however, according to Instruction No. 14.6, is limited to those who are "in the business of putting a product on the market." Under Instruction 14.11, one who is not a manufacturer shares in the liability of the manufacturer of a defective or unreasonably dangerous product if he is a supplier "in the chain of distribution" of the product. Under the common, ordinary meanings of "supplier" and "chain of distribution," I cannot agree that the ultimate purchaser of a product can be considered to have "supplied" or "distributed" that product so as to come within the embrace of the strict liability rules. If he could, there would be no end to those defendants—business and non-business people alike—who would be swallowed in the theory of strict liability. I can foresee automobile owners being held strictly liable to expense-sharing passengers for defective automobile designs which cause injury; contractors who purchase defective equipment being held strictly liable to operators of the equipment who are injured while using the equipment; businessmen being held strictly liable to an employee who gets hurt by an office paper-cutting machine. In my opinion, those *owners* of equipment were never intended to be considered "suppliers" or "in the chain of distribution" when the product was not obtained for the purpose of "marketing" the product, any more than a boarding house or motel owner should be held to have intended to "market" his sofa or gas heater when he furnished a room for rent.

*Stang v. Hertz Corp.,* 83 N.M. 730, 497 P.2d 732 (1972), expressly approved language from an Arizona opinion, that "the doctrine of strict liability was evolved to place liability on the party *primarily responsible* for the injury occurring, *that is, the manufacturer of the defective product.*" (Quoting from *Lechuga, Inc. v. Montgomery,* 12 Ariz.App. 32, 467 P.2d 256 (1970) with emphasis added.) *Stang* extended "party primarily responsible" to retailers and lessors in the business of selling or leasing the defective product.

*Rudisaille v. Hawk Aviation, Inc.,* 92 N.M. 575, 592 P.2d 175 (1979), cited by the majority, is not a similar case. Hawk Aviation leased airplanes whose only purpose was to be able to fly. When, because of an unreasonably dangerous condition, an airplane cannot maintain flight, it is the very *product* leased that fails. A motel *room* is not leased solely to provide heat; an *apartment* is not leased solely to furnish a sofa to the tenant. Those are not the *products* in which a landlord deals; they are merely incidentals to the principal business of the landlord.

I am unable to equate renting a motel room with putting a gas heater on the market, notwithstanding California's apparent solitary position on this kind of extension of the strict liability doctrine. New Jersey refused to impose strict liability on a landlord in *Dwyer v. Skyline Apartments, Inc.,* 123 N.J.Super. 48, 301 A.2d 463, 467, aff'd 63 N.J. 577, 311 A.2d 1 (1973), because to do so would place an "*unusual* and *unjust* burden on property owners."

I see no acceptable authority to enlarge the scope of strict liability principles to defendants Livingston for a design defect which would or could be traceable to the manufacturer or distributor who placed the product on the market. In my view, the Livingstons are not suppliers, but are *purchasers* of a *product* perhaps manufactured, and undoubtedly distributed, by Montgomery Ward. Montgomery Ward might well be liable in strict liability if the heater was defective; the Livingstons might well be liable for negligence in maintaining a defec-

tive placement design if that can be proven. There is, in my opinion, a question of fact of the Livingstons' negligence in maintenance and repair. But just as defendant was in the business of furnishing food rather than plate glass windows in *Lay v. Vip's Big Boy Restaurant, Inc.,* 89 N.M. 155, 548 P.2d 117 (Ct.App.1976), the defendants Livingstons here were in the business of furnishing sleeping quarters, not gas heaters. They, no more than Vip's, should be held subject to strict liability for a product purchased by them for use in their business. The heater was removed from the stream of commerce when it was purchased and installed. Ergo, the Livingstons are not "suppliers."

Summary judgment on this Count IV should be affirmed.