339 So.2d 1285 (1976)
Jim DIXON, Jr., Plaintiff-Appellant,
v.
J. E. GUTNECHT et al., Defendants-Appellees.
No. 10812.
Court of Appeal of Louisiana, First Circuit.
November 15, 1976.
Rehearing Denied December 20, 1976.
Writ Refused February 18, 1977.
*1286 Joseph A. Gladney, Baton Rouge, for plaintiff-appellant.
Shelby W. McKenzie, Vernon P. Middleton, Carey J. Guglielmo, Baton Rouge, for defendants-appellees.
Before SARTAIN, CHIASSON and EDWARDS, JJ.
SARTAIN, Judge.
Plaintiff, Jim Dixon, Jr., was seriously and permanently injured on March 6, 1970, at the Kaiser Aluminum & Chemical Company (Kaiser) plant in Baton Rouge, Louisiana. At the time plaintiff, an employee of Kaiser, was stenciling paper bags when two large cartons of these bags fell on him. He sued numerous employees of Kaiser under the theory of executive liability, St. Regis Pulp & Paper Corporation and St. Regis Paper Company, Inc. (St. Regis), the manufacturer of the bags and cartons, alleging that the carton itself was defective and/or that St. Regis was negligent in failing to give proper instructions as to the stacking of these cartons. Other defendants were named and subsequently dismissed via motions for summary judgment. The release of these latter defendants is not an issue.
The cause went to trial on the merits and on the morning of the second day thereof plaintiff entered into a restrictive compromise and settlement with the Kaiser employees and their liability insurer for the sum of $275,000.00. As part of the settlement Kaiser waived any claim it had to the sum of $55,991.68 representing the amounts paid to plaintiff as workmen's compensation weekly benefits and medical expenses. As thus postured, the trial continued for an additional four days amassing a rather large record as the seriousness of the injuries and the complexities of the circumstances would indicate. Plaintiff now appeals from a judgment rejecting his demands as to the remaining defendants. We affirm.

GENERAL FACTS
Kaiser is the manufacturer of certain aluminum products. One of its products is packaged in paper bags in the Hydrate Loadout Building. Kaiser purchases these bags from three sources including St. Regis. The bags are shipped by rail and truck to Kaiser in palletized cartons. When they arrive at the Kaiser plant they are stored in a brick warehouse and also in the Hydrate Loadout Building. The individual bags are removed from the carton in the Hydrate Loadout Building, stenciled to designate the shipment order, filled with the aluminum product, and shipped to Kaiser's customers.
Dixon had removed and stenciled approximately three hundred of these bags when the top two of a stack of four cartons fell on him causing the injuries which precipitated this litigation.
These cartons consist of two large pasteboard boxes approximately 48" × 48" with open (telescopic) tops. Approximately two thousand paper bags are stacked in an interlocking manner in one of the boxes. The other box is then inverted and placed over the box containing the bags. A wooden frame (referred to as a picture frame) is placed on top of the carton. Another frame of similar design together with two by four *1287 runners (stringers) are placed on the bottom of the carton. The whole assemblage is then bound together as one unit with metal bands. The purpose of the stringers is to permit lifting and unloading with a forklift machine. The picture frame across the top is to lend rigidity to the carton so as to facilitate handling. In the trade, the carton thus comprised is referred to as a "palletized telescopic carton, picture frame on top, with two way entry." It weighs approximately 1700 pounds. When bags are needed, the carton is then moved near the bagging machine by a fork-lift machine. The wire band is cut, the picture frame removed, the top box lifted, and the bags removed as needed. The bags themselves are 21" × 24" with a five inch top and bottom and five layers of thickness.
These cartons are stored primarily in a brick warehouse at Kaiser. However, because of the abundance of supplies on hand, they are also stored in the Hydrate Loadout Building. It was Kaiser's practice to stack them as high as these two buildings permitted, generally four-high.
The record contains the testimony of numerous employees of Kaiser and centers around the stability, handling and storage of these cartons. Several forklift operators testified that when the cartons arrived by rail they would be packed very tightly in the boxcars and were very difficult to unload, and frequently, a carton would break or a stringer would break. Apparently, these operators were given no instructions as to how high these cartons should be stacked. When one operator[1] was asked how high did he stack the cartons, he said it all depended on the height of the building. They all knew that a damaged carton was not to be stacked and that the cartons themselves were to be stacked evenly and straight. One operator[2] testified that they were always falling. The testimony as a whole does not support this observation. Another employee[3] had worked for Kaiser for over 29 years and had never seen a stack of cartons topple over or fall. Plaintiff himself worked around these cartons for almost five years and while he observed a broken carton on several occasions on the floor in the mornings when he arrived for work, he had never actually seen or heard of a carton falling. It is impossible to say whether these particular cartons observed by plaintiff on these occasions had fallen or were not stacked because they were already broken as per instructions.
Every supervisory employee of Kaiser who testified stated that he had no knowledge of any of these cartons falling. Further, for a period of fifteen years they had received bags from St. Regis. During this span of time bags arrived without pallets, picture frames or stringers. Earlier, Kaiser had used its own pallets to lift, move or store these cartons on. At no time did they or any person at Kaiser complain to or notify St. Regis that the packaging, palletizing and shipment of these bags presented any problem, was defective, inferior or improper in any manner.
The trial judge, in his written reasons for judgment, stated:
"Numerous witnesses testified in the matter concerning factors which may have precipitated the fall of the cartons and no useful purpose would be served in rendering a detailed review of their testimony. Suffice it to say that the overwhelming weight of their testimony, together with the photographs filed in the record, demonstrate clearly that the real and underlying cause of the accident was the improper stacking of the cartons which was solely attributable to the employees of Kaiser, both in a subordinate and supervisory capacity. In fact, confirmation of this conclusion is graphically evidenced by one photograph (Exhibit P-2 G) taken the day before the incident in the special products building which photograph shows the same cartons which fell on Dixon in a leaning attitude. Obviously, the cartons should not have *1288 been stacked four high and particularly not in the manner depicted. There is no question but that the cartons were stacked there by Kaiser's employees with at least some knowledge on the part of those in charge, including some of the named individuals who were formally named in this litigation.
"Nevertheless, plaintiff's counsel, industriously strives to show that the supplier, St. Regis, was deficient in a number of respects and the Court therefore will undertake to seriously consider each of the complaints described. First, it is asserted that the palletized cartons as shipped by St. Regis, including those involved in the occurrence, were not only improperly designed but were defectively constructed. On this point, plaintiff's own expert, Dr. Gerald Whitehouse, reiterated several times in his testimony that he found no shortcomings in the design or makeup of the pallets and cartons, but felt that the only failing of the supplier, if there was one, was in not apprising its consumer, Kaiser, as to the safe limits to which the cartons could be stacked. Other than the implication that the pallets involved in the accident may have been improperly constructed because of a cracking sound heard by Dixon before the fall, there was no substantive evidence showing defective construction or fabrication of the cartons or pallets.
"St. Regis acknowledged that prior to the accident it did not conduct testing to see how high the cartons could be safely stacked nor did it advise Kaiser as to the safe limits to which they could be stacked. The Court is of the opinion that St. Regis did not have a duty to test cartons for safe stacking nor to warn plaintiff of danger in stacking cartons four high. This is because the law does not require that one undertake to do a vain and useless thing, but only to do that which is reasonable under the circumstances. Singleton v. Olen Mathierson [Olin Mathieson] Chemical Corporation, 131 So.2d 329. Had the product furnished by St. Regis had either some inherent or hidden properties which rendered it or made its use inherently unsafe, then of course adequate testing and sufficient dissemination of this fact to the consumer would be required. But such is not the case in the matter under consideration. To the contrary, all of the properties and characteristics of the product which would make it unsafe were easily observable to a prospective user. Clearly, if the cartons were stacked too high in an imperfect fashion, they would not defy gravity, but would fall. Additionally, the prospective user in this case was an `informed' user, i. e., engineering personnel and experienced forklift operators of Kaiser. Particular in this regard is the case of West v. Hydro-Test, Inc., 196 So.2d 598 (La.App. 1st Cir. 1967), wherein the Court stated:
"`. . . [T]he manufacturer of a dangerous instrumentality is obliged to warn foreseeable users of the limitations of a product when use beyond its limitations may be fraught with potential perils. However, such rule is without application in those instances wherein the injured party either knows or should know the limitations and restricted capabilities of the article.'
"In a similar case, Albert v. J. [&] L., Engineering Company, 214 So.2d 212 (La. App. 4th Cir. 1968), the court declared:
"`Stated another way, the law appears to be simply that a duty to warn is imposed on the manufacturer only when there is a hidden danger not obvious to one using the product.'
"It would be difficult to consider what St. Regis knew about stacking its product that Kaiser did not already know. While the Court is clearly sympathetic with the plaintiff's case because of the magnitude of his injuries, there is no liability owed by St. Regis to him."

ASSIGNMENT OF ERRORS
Plaintiff assigns as error here the failure of the trial judge (1) to hold St. Regis strictly liable as a manufacturer of a defective product; (2) to hold St. Regis liable for failure to design and test the carton for *1289 safe stacking; (3) to hold St. Regis legally responsible for its failure to warn Kaiser of the danger of stacking the cartons four high; and (4) to hold St. Regis liable as a joint tort feasor of Kaiser.
It is evident, from the above assignment of errors, that plaintiff seeks recovery from St. Regis under one of two (or both) theories of law: that is, strict tort liability for a defective product (Error 1) or on the basis of traditional negligence (Errors 2, 3 and 4).
It is argued that by virtue of the holding in Weber v. Fidelity & Casualty Insurance Co., 259 La. 599, 250 So.2d 754 (1971), Louisiana has joined the ranks of those common law jurisdictions who have imposed strict liability on the manufacturer for injuries resulting from the use of a defective product. In Weber, the court stated:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect."
The Weber court did not use the sacramental words "strict liability" nor did it refer to Section 402 A, Restatement of Torts (Second). As a matter of interest, the dissent particularly noted that Louisiana had not yet incorporated this section as such in our jurisprudence. Nonetheless, Weber, has provoked considerable discussion among the writers who have said the decision is "functionally equivalent to and theoretically all but indistinguishable from" Section 402 A (Robertson, 50 Tul.L.R.) and "Weber's implication was clear and left little doubt that the rule there articulated was a virtually verbatim adaptation of the Restatement concept" (Boisfontaine and Allmont, 20 Loy. (N.O.) L.R. 559). Similar views were expressed and the courts so held in Welch v. Outboard Marine Corporation, 481 F.2d 252 (5th Cir., 1973) and Perez v. Ford Motor Co., 497 F.2d 82 (5th Cir., 1974).
In Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974), plaintiff purchased a truck through Reliable, had it adapted to haul pulpwood through G & S, and purchased tires through Montgomery Ward. While the latter defendant was mounting the tires on split rims, a tire "exploded" from the wheel, injuring plaintiff. The court found negligent conduct on the part of G & S and Montgomery Ward, declared G & S to be a manufacturer presumed to know the vice of its product, and exonerated Reliable of any liability as a Seller under C.C. Art. 2531. It is pertinent to the issue here discussed that Weber was not mentioned in the decision. The two dissents expressed the view that Weber and the principle announced in Section 402 A were applicable.
Strict liability in and of itself is nothing new to Louisiana. It is found in cases involving food and drink (LeBlanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So.2d 873 (1953); in matters of redhibition (C.C. Arts. 1920, et seq.); vicinage (C.C. Arts. 667-669); with the latter being tied directly into C.C. Art. 2315 (Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971)). The nature of the conduct complained of and the character of the parties have determined the applicable rules. However, the imposition of strict liability on a manufacturer of a non-bodily-use product is new to our jurisprudence if its advent was occasioned by Weber. We hold that it was.
The invocation of strict liability brings with it a corresponding change in the conventional rights and responsibilities of the parties in a delictual action. In essence, it is liability without proof of specific substandard conduct. All that is required is that the plaintiff prove a defect in the product; that at the time of its failure it was in normal use; that it was unreasonably dangerous in that use; and that the injuries were caused by the defect. The defenses in such an action are the negative of any of the above plus the assumption of *1290 risk as distinguished from contributory negligence. Hastings v. Dis Tran Products, Inc., 389 F.2d 1352 (W.D.La.1975); and Langlois v. Allied Chemical Corporation, above.
In the instant case, the trier of fact found and we agree, that the cartons were not defective. It is for this reason that plaintiff's claim on the basis of strict liability must fall.
Weber theorizes that a product is defective when it is "unreasonably dangerous to normal use . . . if the injury might reasonably have been anticipated." Welch, above, stated that "A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risk involved or if the risks are greater than a reasonable buyer would expect." Neither of these definitions excludes the other and both turn on foreseeable risks.
Plaintiff argues that the cartons were defective for two reasons. One, that the wood used for the picture frames and stringers was inferior and gave way to superior weight; and two, that the design of the cartons was such as to preclude safe stacking beyond the height of two cartons. With respect to the first claim, the trial judge was correct when he stated that other than plaintiff's testimony that he heard a "cracking" sound just before the accident, there is no evidence that would support a conclusion that the wood on these two particular cartons was inferior, broken, weak or otherwise unsuited. To determine that the cartons fell because of a particular defect in the wood would be rank speculation. It is far more reasonable to conclude that the cartons fell because they were improperly stacked. This conclusion is supported by the photograph in the record which very clearly depicts the angle at which the top carton was resting, a condition which had been permitted to exist for hours before the cartons toppled. Plaintiff's own expert could not find fault with the basic design of the single palletized carton.
This leads us to the second contention of plaintiff, i. e., that the design and construction of the carton did not permit safe stacking to the height of four.
This argument must also be rejected. Assuming, which we must, that a cause in fact of the incident was the improper stacking, it must also be shown that the alleged defect in design, which, acting either in conjunction with or independently of the improper stacking, was also a cause in fact of the accident. Plaintiff attempted to show that the design was defective because as the metal bands around the carton were drawn tighter the top of the carton was no longer perfectly flat and therefore it was not possible to stack successive cartons on the level surface. Hence, a stack of four cartons creates a column that is unstable, susceptible of toppling and therefore dangerous. We do not find that the evidence adduced during the course of the trial supports the conclusion that this condition, if it existed, was a cause in fact of the falling of the two cartons which injured plaintiff. Further, plaintiff's entire argument in this regard assumes a premise that is not supported by the record. That is, that St. Regis was required to furnish Kaiser with a carton that could be stacked to the height Kaiser's personnel presumed to stack them.
The type of carton, its composition and design requirements were specified by Kaiser, to-wit: "Palletized telescopic cartons with picture frames on top; two-way entry; 2000 per pallet; rubber dunnage; truck shipments to be single tier or open trucks." St. Regis was not asked or required by Kaiser to design, produce or furnish Kaiser with a carton possessing any particular stacking capability. The individual carton was prepared according to a given customer's need and request.
In the instant case, notwithstanding the testimony of some of Kaiser's operators, St. Regis was never told of any particular problem experienced by Kaiser throughout the years it had purchased bags from St. Regis. Significantly, Kaiser supervisory personnel was satisfied with the cartons as received. St. Regis's own experience with *1291 the stacking of these cartons in its own warehouse disclosed no danger to stacking. For these reasons, we must conclude that plaintiff has failed to satisfy the proof of a defect under either the Weber or Welch rule, above. Certainly, if any object is stacked too high it will have a tendency to fall. This does not make the item itself dangerous or defective. There was nothing inherently dangerous in the carton itself. Only its subsequent improper use made it dangerous in the instant case. By such use, plaintiff was placed in a position of peril. The persons responsible were his immediate superiors who failed to observe and correct a hazardous situation created by the improper placement of one of the cartons in a leaning position.

ERRORS 2 AND 3
As stated above, the sole cause in fact of this accident was the result of improper stacking of the cartons by Kaiser employees. Ordinarily, this would obviate the necessity of discussing the duty owed by St. Regis under the circumstances. Nonetheless, we are satisfied that St. Regis breached no duty to Kaiser and its employees. Plaintiff argues very strongly that the carton sold by St. Regis "was unreasonably and inherently dangerous when stacked in Kaiser's warehouse at a level of four (4) high." Again, plaintiff assumes a premise that is not supported by the record, namely, that St. Regis was required to produce a carton that could be stacked to the level of four high. We find nothing in the record that imposes such a duty on St. Regis. Kaiser, with a staff of engineers and safety experts, had designated the type of carton that they desired and had for years purchased the same from St. Regis without having once voiced a single complaint as to its construction or any of the difficulties some of plaintiff's witnesses (Kaiser forklift operators) claimed to have experienced. This is not to say that St. Regis, with impunity, could unleash on its customers a product that was fraught with danger. But, there is nothing inherently dangerous in the carton itself. Only its subsequent improper use made it dangerous in the instant case. It was just such a use that placed plaintiff in a position of peril. St. Regis's duty was to produce a product that in its normal and reasonably foreseeable use would not be hazardous to others. We do not construe and cannot say that stacking these cartons four high falls within the category of normal use. St. Regis, after having produced the carton according to Kaiser's specifications, was not required to follow its product into the market place in an effort to preclude any and all possibilities of injury, including the manner in which such cartons were stored or stacked. We do not assume for one minute that these cartons are incapable of being stacked to the level of four high because the evidence on this point is inclusive. Be that as it may, the unalterable fact remains that this was not a requirement placed on St. Regis by Kaiser or a duty that falls within the purview of reasonableness and is therefore imposed by law.
Plaintiff argues very strongly that the test performed by Kaiser's engineers after the accident caused Kaiser to limit future stacking to two cartons and then only after requiring heavier stringers. We can only assume that this was a double precaution exercised by Kaiser taking into account their own storage requirements. But, even then plaintiff's own expert conceded that the earlier cartons could be reasonably stacked two high. Under these conditions, we fail to see how St. Regis was guilty of negligence in the premises.

ERROR 4
Lastly, plaintiff argues that St. Regis is a joint tort feasor of Kaiser and inasmuch as the trial court has found Kaiser guilty of negligence, St. Regis should also be cast in judgment. We agree that Kaiser supervisory personnel were negligent in failing to observe the manner in which these cartons were improperly stacked, thereby permitting plaintiff to work in an area that was unsafe which resulted in his injuries. However, we find no grounds upon which to base a finding of *1292 negligence on St. Regis. Two or more persons may be liable in solido for injuries to another when the individual acts of those persons contribute to the incident which caused the injuries. In the instant case we find no negligent conduct on the part of St. Regis for the reasons stated above. The only other basis on which a finding of liability in solido of St. Regis with Kaiser would be upon a showing that St. Regis caused, assisted or encouraged Kaiser in the commission of the offense for which Kaiser itself is deemed to be negligent. C.C. Art. 2324. In this matter St. Regis was the manufacturer-vendor of a product sold to Kaiser and nothing more.
Accordingly, for these reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] Douglas W. Partin
[2] John Bergeron
[3] Edgar Ruiz