FIRST DIVISION

June 30, 1997

No. 1-95-0375

FLORITO PEREZ and GLORIA PEREZ,

Plaintiffs-Appellants,

v.

FIDELITY CONTAINER CORPORATION,

Defendant-Appellee,

and 

MEAD CORPORATION,

Third-Party/ 

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County.

No. 90 L 2771

Honorable

Irwin J. Solganick,

Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiffs, Florito and Gloria Perez, appeal from a directed verdict for defendant, Fidelity Container Corp., in a personal injury action alleging strict product liability and negligence.  We affirm the directed verdict as to the product liability count and reverse and remand as to the negligence count.

FACTS

Plaintiff Florito Perez was employed by Edsal Manufacturing Company.  Edsal manufactured steel shelving, storage cabinets and shop furniture on five production lines.  The company used corrugated cardboard cartons for its product.  Each of its production lines used a different sized carton. 

Edsal purchased its cardboard cartons from Fidelity, which designed and distributed packaging.  The boxes were produced for Fidelity by third-party defendant, Mead, which manufactured them pursuant to Fidelity's instructions.  Fidelity normally conveyed a customer's specific unitizing or baling requirements for packaging to Mead but did not instruct Mead on how to unitize bales intended for shipment to Edsal.

Having received no instruction to the contrary, Mead baled Fidelity's cartons for Edsal in units of 250, banding the bales together with plastic straps.  A 250-unit bale of collapsed cartons stood 45 inches tall and, depending on the cartons' dimensions, could weigh as much as 1,300 pounds.  Mead shipped the 250-unit bales directly to Edsal on wooden pallets or skids.  At Edsal, the skids of collapsed cartons were stacked and moved to and from the production line by forklifts.  

The bales were unbanded by Edsal employees at the production line so the cartons, along with their covers and inserts, could be formed, assembled, and packed.  As workers pulled cartons off the unbanded stack one by one, the stack would shift and, over a period of time, become disheveled and unstable.  At the end of each workday, stacks of unused cartons from opened bales were moved by forklift from the production lines back to the shipping area for storage.  The stacks of loose cartons were then stored atop 

5½-foot-tall rolling shop carts.  Having come from different production lines, the collapsed cartons stored in this manner were of assorted sizes.  The loose cartons were not secured in any manner, but simply piled one atop another in twisted stacks reaching as high as 30 feet.  Vibrations from the punch presses or forklifts in the shop would sometimes cause these loose stacks of cartons to fall.

Edsal employed Florito to clean up and sweep the shop floor at the end of the day.  The dumpster he used was located in the shipping area, past the shop carts stacked with loose cartons.  As he was walking past the shop carts, Florito heard a noise like a skid breaking and a stack of boxes approximately five-feet-four inches high fell on top of him.  The company nurse found Florito on the floor amongst the loose cartons and several displaced banded bales; his pelvis was crushed and he sustained other injuries.

Florito and Gloria Perez filed a two-count complaint against Fidelity based on strict product liability and common law negligence.  The complaint alleged that Fidelity was liable for Florito's injuries as a result of a defective bale of cartons that it had delivered to Edsal.  Fidelity filed a motion to dismiss, contending the injury to Florito did not involve any product.  The trial court denied the motion on grounds a banded bale of cartons was a product.  Fidelity then filed a third-party action for contribution against Mead.  

Thereafter, Fidelity filed a motion for summary judgment contending that the banded bale of cartons was not defective for either product liability or negligence liability and that there was no act or omission by Fidelity that caused or contributed to Florito's injury.  The motion was denied.

The matter was then assigned to trial.  Fidelity filed a motion 
in limine
 seeking to exclude certain opinions of plaintiffs' expert, James Bodi, relating to possible alternative means of safely securing the bales.  The trial court initially granted the motion, but reversed itself upon plaintiffs' motion to reconsider.

At trial, Frank Castro, the production superintendent at Edsal, testified that at the time of the accident, Edsal had the ability to reband loose corrugated cardboard cartons removed from the production line.  He added, however, that the Edsal employees responsible for rebanding loose cartons had quit in early 1988 and had not been replaced as of the date of Florito's injury.  William D. Ross, president of Fidelity, testified that bundling smaller quantities of cartons within the bales was inappropriate.  Ross explained that bundling is helpful for cartons small enough to be transported manually but accomplishes nothing for cartons large enough to require use of a forklift.  Edward Elsroth, testifying on behalf of Mead, likewise claimed that bundling smaller quantities of cartons within the bales was possible but "would have been ridiculous on a sheet of this size."

Immediately before the plaintiffs called their expert, James Bodi, to testify, Fidelity renewed its motion to exclude his opinions.  James Bodi was expected to testify that Fidelity could have safely secured the bales by (i) bundling the cartons in smaller packages, (ii) stretch wrapping the load, (iii) treating the collapsed cartons with an antiskid coating before baling, or (iv) banding the bales with reusable strapping.  After extended argument, the trial court granted Fidelity's motion on grounds Bodi's opinions were unreliable, based on speculation and conjecture, and were contrary to the evidence adduced at trial.  After plaintiffs presented the rest of their case, Fidelity moved for a directed verdict.  The trial court found that Fidelity owed no duty to Florito, that it could not have foreseen Florito's injury, and that the product was not defective in design or manufacturing.  Accordingly, the trial court granted Fidelity's motion for directed verdict.  This appeal followed.

DISCUSSION

On appeal, plaintiffs first argue that the trial court erred in directing a verdict for Fidelity on the strict product liability count of their complaint.  Directed verdicts are appropriate only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 229 N.E.2d 504 (1967).

To recover under strict product liability, a plaintiff must plead and prove that the injury or damage resulted from a condition of the product manufactured by the defendant, that the condition was an unreasonably dangerous one, and that the condition existed at the time the product left the manufacturer's control.  
Coney v. J.L.G. Industries, Inc.
, 97 Ill. 2d 104, 111, 454 N.E.2d 197, 200 (1983), citing 
Suvada v. White Motor Co.
, 32 Ill. 2d 612, 623, 210 N.E.2d 182 (1965) (adopting the Restatement (Second) of Torts §402A (1965)).  

Plaintiffs' complaint alleged that at the time the bundle of cartons left Fidelity's possession and control, it was unreasonably dangerous and defective in that: 

"a) They designed, manufactured, and sold the bundles of cartons in such a manner that they were stacked too high in the said bundle for their safe intended use;

b) Improperly stacked the cartons in the said bundle to prevent the slippage and falling of the said cartons in the bundle when said bundle was being used in a reasonably foreseeable manner;

c) Fail[ed] to stack the cartons in said bundle in such a way as to prevent the slipping and falling and overturning of the said cartons and bundle when being used in a reasonably foreseeable manner;

d) Failed to design the bundle of said cartons in such a way as to prevent the shifting and slipping and falling of said carton[s] when being moved from location to location in a factory setting, all of which was reasonably foreseeable.

e) Improperly banded by the used [
sic
] of plastic straps, the stack of cartons in the said bundle to the skid, knowing that the said cartons would shift, slip and fall when the banding would be cut or removed;

f) Failed to attach adequate cautionary notice and warnings to the said bundles, or to otherwise warn the person using the said bundles and persons being in the vicinity of said bundles, that the bundles of cartons stacked as aforesaid would slip, shift and fall; and

g) Failed to design and stack the bundles in a manner to prevent the slipping, sliding and falling of the said cartons, when used in a foreseeable manner; and

h) Used inadequate skids to form a proper and stable base for the said bundle of cartons."

Plaintiffs contend the record shows that Fidelity's design and specifications for the boxes that fell on Florito caused the cartons to be dangerous when put to their normal use, that Fidelity knew the cartons would be left standing after being unbound, and  that the large size and significant weight of the cartons created an unreasonable risk of harm to anyone near them.  In light of this evidence, plaintiffs argue that the trial court erred in granting Fidelity's motion for directed verdict on the strict product liability count of plaintiffs' complaint.  We disagree.

It is unclear from plaintiffs' complaint whether the allegedly defective product was the carton, the bundle, the banding, or the skid.  At trial it was the plaintiffs' theory that the unbound stacks of collapsed cartons constituted a "product" and that the stacks were unreasonably dangerous because they weighed some 1,300 pounds and were inherently unstable.  In support of their argument, plaintiffs rely primarily upon 
Lewis v. Stran Steel Corp.
, 57 Ill. 2d 94, 311 N.E.2d 128 (1974).  Plaintiffs' reliance is misplaced.

In 
Lewis
 a sheet of steel slipped from a banded bundle of panels being transported by forklift injuring the plaintiff.  At trial, the safety supervisor for plaintiff's employer testified that the steel bands on the bundle were intact but loose, some being "loose enough to put [his] hand in between."  57 Ill. 2d at 99, 311 N.E.2d at 131.  Thus, while it might be argued that 
Lewis
 supports the proposition that a banded bundle is a product, it does not support plaintiffs' claim that an unbanded stack is a product.

Plaintiffs nevertheless press on arguing, in essence, that a stack is a product that suffers from defective "unitization."  Moreover, plaintiffs argue that the proffered testimony of their expert witness would have established the existence of a packaging defect.  While it is true that a strict product liability action may be based upon injury resulting from defective packaging (see  Restatement (Second) of Torts §402A, Comments 
g
, 
h
 (1965)), we nevertheless disagree with plaintiffs' analysis.

The question of the scope and substance of the term "product" as used in product liability law in this State was discussed at length in 
Lowrie v. City of Evanston
, 50 Ill. App. 3d 376, 379-85, 365 N.E.2d 923, 925-29 (1977).  After an extensive review of pertinent Illinois case law, the Restatement and its commentary, and of the history and purposes of product liability, the 
Lowrie
 court concluded "that the policy reasons underlying the strict product liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than * * * focusing on the dictionary definition of the word."  50 Ill. App. 3d at 383, 635 N.E.2d at 928.  Public policy considerations advanced to support the imposition of strict liability include: (1) the public interest in human life and health; (2) the invitations and solicitations of the manufacturer to purchase the product, representing it as safe and suitable for use; (3) the justice of imposing the loss on the party who created the risk and reaped the benefit; and (4) the superior ability of the commercial enterprise to distribute the risk of injury proximately caused by the defective condition of its product by passing the loss on to the public as a cost of doing business.  
Immergluck v. Ridgeview House, Inc.
, 53 Ill. App. 3d 472, 474, 368 N.E.2d 803, 804 (1977).  

Although 
Lowrie
 has been applied in numerous Illinois cases (see, e.g., 
Immergluck
, 53 Ill. App. 3d 472, 368 N.E.2d 803 (professional services and buildings); 
Dubin v. Michael Reese Hospital & Medical Center
, 74 Ill. App. 3d 932, 393 N.E.2d 588 (1979) (x-radiation and electricity); 
Heller v. Cadral Corp.
, 84 Ill. App. 3d 677, 406 N.E.2d 88 (1980) (condominium unit); 
Moorman Manufacturing Co. v. National Tank Co.
, 92 Ill. App. 3d 136, 414 N.E.2d 1302 (1980) (storage tank); 
Walker v. Shell Chemical, Inc.
, 101 Ill. App. 3d 880, 428 N.E.2d 943 (1981) (guardrail incorporated into a building); 
Hammond v. North American Asbestos Corp.
, 97 Ill. 2d 195, 454 N.E.2d 210 (1983) (asbestos); 
Boddie v. Litton Unit Handling Systems
, 118 Ill. App. 3d 520, 455 N.E.2d 142 (1983) (conveyor); 
Hubbard v. Chicago Housing Authority
, 138 Ill. App. 3d 1013, 487 N.E.2d 20 (1985) (steam pipes incorporated into building); 
Duncavage v. Allen
, 147 Ill. App. 3d 88, 497 N.E.2d 433 (1986) (lights, windows and window locks incorporated into building)), none have addressed the particular question presented here.  Accordingly, we address the plaintiffs' argument that a stack is a product that suffers from defective "unitization" as an issue of first impression and look for guidance in our decision to similar cases from other jurisdictions.  For reasons that follow, we find that a stack is not a "product" within the meaning of section 402A and the trial court properly directed a verdict for the defendants on the strict product liability count of plaintiffs' complaint.

In 
Spellmeyer v. Weyerhaeuser Corp.
, 14 Wash. App. 642, 544 P.2d 107 (1975), a longshoreman employed to assist in moving the defendant corporation's wood pulp out of port storage facilities for further shipment brought action, 
inter
 
alia
, on a theory of strict liability for injuries received when he was struck by bales falling from a disintegrating eight-bale unit of pulp.  The evidence in that case showed that the metal band on the involved unit of bales had been loose prior to the attempt to lift the load by forklift and was broken after the fact.  It did not, however, establish the specific cause of the break or whether the band parted before or during the insertion of the forks.  14 Wash. App. at 643, 544 P.2d at 108.  Spellmeyer alleged in his complaint that Weyerhauser "produced, manufactured, and packaged its product in a defective condition unreasonably dangerous to handlers" in that it "fail[ed] to properly unitize the baled wood pulp for handling and storage."  14 Wash. App. at 644-45, 544 P.2d at 108-09.  In the absence of any evidence of a defect in the bands other than pure speculation, the court declined to apply the doctrine of strict liability.  The 
Spellmeyer
 court reasoned:

"Imposition of strict liability is premised on the sound policy consideration that the manufacturer who markets his product for use and consumption by the general public is best able to bear the risk of loss resulting from a defective product. The thrust of Section 402A is, accordingly, to protect the 'ultimate user or consumer' of the product."  14 Wash. App. at 646, 544 P.2d at 109.

Applying this reasoning to the facts at hand,  the 
Spellmeyer
 court stated:

"Weyerhauser produced and packaged a raw material in an intermediate state, which was stored awaiting shipment to another processor.  It did not harm or endanger any 'ultimate user or consumer'; only expert loaders and expert carriers were required to deal with it.  We therefore conclude that, because of the character of the 'product' and the status of the plaintiff, the policy considerations which support imposition of strict liability in other contexts are too severely diluted here and dismissal was correct as to the strict liability theory."  14 Wash. App. at 646, 544 P.2d at 109-10.

In 
Dixon v. Gutnecht
, 339 So.2d 1285 (La. App. 1976), the plaintiff was injured at a Kaiser Aluminum & Chemical Company (Kaiser) plant when two large cartons of paper bags intended to be used by Kaiser as packaging for its product fell on him.  Kaiser purchased the bags from the manufacturer (St. Regis).  The bags were shipped to Kaiser in palletized cartons.  The cartons consisted of two large boxes approximately 48 inches x 48 inches with open tops.  Approximately 2,000 paper bags were stacked in an interlocking manner in one of the boxes.  The other box was then inverted and placed over the box containing the bags.  Wooden pallets were then placed above and below the cartons and the whole assemblage bound together as one unit with metal bands.  The palletized cartons weighed approximately 1,700 pounds.  Upon their arrival at the Kaiser plant,  the palletized cartons were stored until such time as the bags contained therein were needed.  When bags were needed, the cartons were moved by forklift to the bagging machine, the wire band cut and the cartons opened.  Individual bags were then removed from the cartons, stenciled to designate the shipment order, filled with product, and shipped to Kaiser's customers.  

Some of the palletized cartons were stored near the bagging machine,  and it was Kaiser's practice to stack them as high as the building would permit.  339 So. 2d at 1287.  The plaintiff was in the process of stenciling bags when the top two of a stack of four cartons stored nearby fell on him causing injuries.  The plaintiff sued St. Regis alleging, 
inter
 
alia
, that the carton was defective.  339 So.2d at 1286.  Following a trial, the trial court, in its written reasons for its judgment in favor of St. Regis, stated:

"[T]he overwhelming weight of * * * testimony, together with the photographs filed in the record, demonstrate[s] clearly that the real and underlying cause of the accident was the improper stacking of the cartons which was solely attributable to the employees of Kaiser * * *"

In response to the plaintiff's allegation that the palletized cartons were not only improperly designed but also defectively constructed, the 
Dixon
 trial court noted:

"Other than the implication that the pallets involved in the accident may have been improperly constructed because of a cracking sound heard by Dixon before the fall, there was no substantive evidence showing defective construction or fabrication of the cartons or pallets."  339 So. 2d at 1288.

The 
Dixon
 trial court concluded that "St. Regis did not have a duty to test cartons for safe stacking nor to warn plaintiff of danger in stacking cartons four high" on grounds that "all of the properties and characteristics of the product which would make it unsafe were easily observable to the prospective user."  The court added that, "[c]learly, if the cartons were stacked too high in an imperfect fashion, they would not defy gravity, but would fall."  339 So. 2d at 1288.

On appeal, the plaintiff in 
Dixon
 assigned as error the failure of the trial judge to hold St. Regis strictly liable as a manufacturer of a defective product.  After noting that Louisiana had adopted the common law equivalent of section 402A (339 So. 2d at 1289), the court of appeals affirmed.  In so doing, it rejected the plaintiff's argument that the cartons were defectively designed in that they could not be safely stacked more than two high.  339 So. 2d at 1290.  The court of appeals explained that "[t]o determine that the cartons fell because of a particular defect in the wood would be rank speculation."  The court added that St. Regis was not "required to furnish Kaiser with a carton that could be stacked to the height Kaiser's personnel presumed to stack them," as it had never been "asked or required by Kaiser to design, produce or furnish Kaiser with a carton possessing any particular stacking capability."  339 So. 2d at 1290.  The court of appeals therefore concluded its analysis, stating:

"Certainly, if any object is stacked too high it will have a tendency to fall.  This does not make the item itself dangerous or defective.  There was nothing inherently dangerous in the carton itself.  Only its subsequent improper use made it dangerous in the instant case.  By such use, plaintiff was placed in a position of peril.  The persons responsible were his immediate superiors who failed to observe and correct a hazardous situation created by the improper placement of one of the cartons in a leaning position."  339 So. 2d at 1291.

Finally, in 
Elk Corp. v. Jackson
, 291 Ark. 448, 727 S.W.2d 856 (1987), a truck driver was injured when 740 rolls of roofing felt banded together in bundles of 20 and loaded onto a flatbed truck by Elk Corporation employees (Elk) shifted during transport, causing the truck to overturn.  Jackson, the injured truck driver, alleged that "Elk's failure to secure the bundles of twenty rolls of roofing with two metal bands, rather than a single band, caused the bundles to be more likely to come apart and thus made them unreasonably dangerous as 'packages'."  291 Ark. at 458-A, 727 S.W.2d at 856.  In support of his argument, Jackson maintained that banding the rolls together for shipment was "packaging" in the same manner that a carton containing Coke bottles is a package.  The supreme court applied Arkansas' strict product liability statute (Ark. Stat. Ann. §34-2802(e) (Supp. 1985)) which, like section 402A of the Restatement provides that product liability may be premised upon injury resulting from defective packaging, and came to a different conclusion.  It distinguished "a shipper's act of banding together rolls of roofing for loading a tractor-trailer" (291 Ark. at 458-B, 727 S.W. 2d at 857) from the Coke carton intended as "an integral part of the product and its use." 291 Ark. at 458-B,727 S.W. at 857.  It stated:

"[W]e consider the rolls of roofing themselves to be the only 'product' in this case.  The act of banding them together for shipment is simply part of the loading and transporting process for which Elk can only be liable on a negligence theory."  291 Ark. at 458-B, 727 S.W. 2d at 857.

Applying the findings of 
Spellmeyer
, 
Dixon
, and 
Elk
 to the facts herein, we conclude that, under 
Lowrie
, the unbound stacks of collapsed cartons did not constitute a "product" within the meaning of section 402A.  The public interest in human life and health does not purport to protect Florito under these facts.  He was not the 'ultimate user or consumer' of Fidelity's cartons but, rather, an Edsal employee whose position brought him into daily contact with stored cartons as they awaited transport to Edsal's production line.  
Spellmeyer
, 14 Wash. App. 646, 544 P.2d 107.  Furthermore, we find no evidence Edsal ever requested that Fidelity provide it with cartons designed and unitized in a manner suitable for storage in jumbled stacks atop movable shop carts, nor that Fidelity ever represented it was safe to store its cartons in such a manner.  
Dixon
, 339 So. 2d 1285.  Rather, the evidence is clear that Fidelity banded its cartons together in 250-unit bales for shipment and that the bands were not intended as an integral part of the cartons or their use.  
Elk Corp.
, 291 Ark. 448, 727 S.W.2d 856.  Finally, we see little justice in imposing the loss on Fidelity when it was Edsal that created the risk by storing the cartons in such obviously hazardous stacks  (
Dixon
, 339 So. 2d 1285) and that also as a manufacturer was capable of passing the loss on to the public.  In the absence of public policy considerations supporting a finding that a stack of cartons is a product within the meaning of section 402A, we decline to do so.  
Lowrie
, 50 Ill. App. 3d 376, 365 N.E.2d 923.  We therefore reject plaintiffs' argument that a stack is a product which suffers from defective "unitization."  

This result is consistent with other Illinois cases, which establish that misuse of product or assumption of risk may bar recovery under strict product liability theory (see 
Williams v. Brown Manufacturing Co.
, 45 Ill. 2d 418, 261 N.E.2d 305 (1970)), recognize that the term "products liability" does not normally encompass injury resulting from a condition on the premises, as distinguished from injury occasioned by a defective product (see generally 
Duncavage v. Allen
, 147 Ill. App. 3d 88, 497 N.E.2d 433 (1986); Black's Law Dictionary 1089 (5th ed. 1979)), and conclude that product liability does not make a manufacturer an insurer of all foreseeable accidents that involve its product (see 
Hunt v. Blasius
, 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372 (1978); 
Coney
, 97 Ill. 2d at 111, 454 N.E.2d at 200).  In sum, the unbound stacks of cartons are not defective or unreasonably dangerous merely because it is possible to be injured while using them.  We therefore affirm the trial court's grant of a directed verdict in favor of Fidelity on the strict product liability count of plaintiffs' complaint.  
Pedrick
, 37 Ill. 2d 494, 229 N.E.2d 504.

This brings us to a tangential concern: the plaintiffs' argument on appeal that the trial court erred in excluding the testimony of plaintiffs' expert, James Bodi, relating to possible alternative means of safely securing the bales.  Because we have concluded that a stack is not a product that might suffer from defective "unitization," Bodi's testimony was irrelevant to plaintiffs' strict product liability claim and thus properly excluded from evidence on that count.

Plaintiffs next contend that the trial court erred in directing a verdict for Fidelity on the common law negligence count of their complaint.  Liability attaches under the common law negligence doctrine where plaintiff proves duty, breach, injury, and causation.  
Duncavage
, 147 Ill. App. 3d at 96, 497 N.E.2d at 437.  

Plaintiffs' complaint alleged that Fidelity had a duty to exercise ordinary care in the design, manufacture, packaging and sale of its bundles of cartons, but was careless and negligent in that it: 

"a) Designed, manufactured and sold bundles of cartons that were not reasonably safe for their intended use in a factory setting;

b) Failed to design, stack, fasten or secure said bundle of cartons so as to prevent [sic] said cartons from shifting, slipping, and falling when being used in a reasonably foreseeable manner;

   c) Stacked said cartons in a bundle with inadequate binding and placed said cartons on a defective or inadequate base or skid so as to render the load unstable when being used in a reasonably foreseeable manner;

d) Sacked [sic] said cartons in a bundle of excessive height and weight so as to render the bundle unstable and dangerous when used in a reasonably foreseeable manner; 

e) Failed to give adequate instructions on the proper use and handling of said bundles, and failed to give adequate warning of the risks involved in the use and handling of said bundles;

f) Used inadequate and broken wooden skids on which the bundles were placed which rendered the load unstable; and

g) Failed to provide a reasonable method for securing the bundle for moving purposes once the load had been opened for use."

Here again, plaintiffs contend the record shows that Fidelity's design and specifications for the boxes that fell on Florito caused the cartons to be dangerous when put to their normal use, that Fidelity knew the cartons would be left standing after being unbound, and that the large size and significant weight of the cartons created an unreasonable risk of harm to anyone near them.  In light of this evidence, plaintiffs argue that the trial court erred in granting Fidelity's motion for directed verdict on the common law negligence count of plaintiffs' complaint.  We agree.

The trial judge entered a directed verdict in favor of Fidelity on plaintiffs' common law negligence claim "for the reasons given in open court."  In open court, the trial judge stated, 
inter
 
alia
:

"The only evidence that I have heard in this particular cause that would lead the Court to believe that anybody was negligent was that Edsal through its various employees on the shop line in the stacking of their cartons and placing the cartons in the heights that they were placed or in the manner in which they were placed, possibly Mr. Perez, if the Court is to believe Mr. Castro's statement that Mr. Perez said he had pushed the cart or to sweep as the cart that contained the cartons that fell upon him that possibly Mr. Perez may also have been negligent; but I have seen nothing that would lead the Court to believe that Fidelity Container Corporation based on the facts that have been presented so far as a matter of law would lead the trier of facts to believe that the defendant was negligent." 

The trial court's comments reveal that it did not properly apply the 
Pedrick
 standard.  Rather than viewing the evidence in its aspect most favorable to the plaintiffs, the trial court ignored proffered testimony (1) Fidelity had a duty to secure its bales of cartons so that they could be safely transported to Edsal's production line, (2) it knew how Edsal stacked leftover cartons yet failed to unitize the cartons in smaller, lighter, bundles, stretch wrap the load, treat the cartons with an antiskid coating, or band the bales with reusable strapping, and (3) Fidelity's failure to do so was a cause of Florito's injuries.  It then weighed the remaining evidence and determined that Edsal and perhaps also the injured plaintiff were wholly at fault.  Accordingly, we reverse the trial court's grant of Fidelity's motion for a directed verdict on the common law negligence count of plaintiffs' complaint and remand the matter for further proceedings.  
Pedrick
, 37 Ill. 2d 494, 229 N.E.2d 504.  

Because we remand on the common law negligence count, we again address plaintiffs' tangential claim that the trial court erred in excluding the testimony of plaintiffs' expert, James Bodi, relating to possible alternative means of safely securing the bales.  Because expert testimony will be needed to establish the nature and extent of Fidelity's common law duty, and whether it breached that duty (see 
Pease v. Ace Hardware Home Center of Round Lake No. 252
, 147 Ill. App. 3d 546, 553, 498 N.E.2d 343, 348 (1986)), and because the trial court allowed William D. Ross of Fidelity and Edward Elsroth of Mead to testify that bundling smaller quantities of cartons within the bales was inappropriate and ridiculous, plaintiffs also should have been allowed to present expert testimony that it was not.  Bodi's testimony was therefore both relevant and necessary to plaintiffs' common law negligence claim and should have been admitted in relation to that count.  

We therefore order that, on remand, the plaintiffs' expert should be permitted to testify and the trier of fact permitted to determine whether, in light of that testimony, Fidelity's practice of securing its 250-unit bales of cartons with a single, nonreusable, strap constituted negligent conduct.  See 
Lewis
, 57 Ill. 2d at 101-02, 311 N.E.2d at 132-33; 
Spellmeyer
, 14 Wash. App. at 649-50, 544 P.2d at 110-12; 
Elk Corp.
, 291 Ark. 448, 727 S.W.2d 85.

Affirmed in part; reversed in part, and remanded for further proceedings not inconsistent with this opinion.

CAHILL, J., and THEIS, J., concur.